## PETTY *v.* BRUNSWICK & WESTERN RAILWAY CO.

1. A contract between an employee and his master, or another acting in the latter's interest, by the terms of which the employee when physically injured, whether as a result of his own negligence or not, or when sick, is to receive pecuniary and other valuable benefits, and which stipulates that his voluntary acceptance of any of such benefits in case of injury is to operate as a release of the master from all liability on account thereof, is not contrary to public policy.

2. That such a contract secured to the employee substantial benefits, and that the master contributed to the fund for the payment thereof, constituted a valuable consideration as to the employee; and this is true though he himself made a small monthly contribution to that fund.    A contract of this kind is not wanting in mutuality.

3. One who deals with an "association" as a legal entity capable of transacting business, and in consequence receives from it money or other thing of value, is estopped from denying the legality of its existence or its right to contract.

4. A ground of a motion for a new trial complaining of the admission of written evidence will not be considered unless the evidence objected to is set forth, either literally or in substance, in the motion itself, or attached thereto as an exhibit.

5. A contract will not be set aside on the ground of fraud in its procurement, at the instance of one who has neither restored nor offered to restore the fruits thereof.

6. The acceptance by an injured employee of any benefit under a contract of the kind indicated in the first of the preceding notes is an election on his part to look exclusively to that source for compensation on account of the injury, and amounts to a complete accord and satisfaction of his claim for damages against his master therefrom arising.

7. This court can not, when there is nothing in the record to warrant its so doing, undertake to say whether the formation by a particular combination of railway and other corporations of a "Relief and Hospital Department" was, or was not, ultra vires.

Argued November 11, 1899. — Decided January 30, 1900.

Action for damages. Before Judge Atkinson. City court of Brunswick. May 6, 1899.

*W. G. Brantley* and *Johnson & Krauss*, for plaintiff.
*W. E. Kay*, for defendant.

LUMPKIN, P. J.   On July 1, 1896, the Brunswick & Western Railway Company and certain other corporations constituting what was known as the "Plant System of Railways" entered· into an agreement in writing which, among other things, recited that they had "determined to establish a Relief and Hospital Department, the scope, character, objects and purposes of which" were set forth in a writing thereto attached, embodying the proposed regulations under which such department was to be conducted.   Each of these several corporations obligated itself to contribute ratably to a fund of $12,-000 to be used in the establishment and maintenance of this new department, and further agreed to pay its just proportion of "any sum necessary to make up any deficit which [might] at any time occur in the operations" thereof.   Provision was likewise made for the payment of "the salary of the Superintendent and Chief Surgeon of said department," and for meeting the expense of building such hospitals as the parties to the agreement might thereafter determine to erect.   Subsequently the proposed "Relief and Hospital Department" was duly organized, and at once began operations in conformity with the regulations above referred to.   Provision was therein made for the payment, to such employees as might become members, of certain fixed benefits in the event of their being "disabled by accident or sickness," their families to become beneficiaries in · cases of death.   The fund out of which payments were to be made was to "consist of contributions from the employees and the" several companies belonging to the Plant System, "income derived from investments, and appropriations by" such companies "when necessary to make up a deficit."   These companies were to assume "general charge of the department, guarantee the fulfillment of its obligations, and become the custodian of its funds, with full responsibility therefor," and were also to "contribute to the department twelve thousand

dollars ($12,000) per annum, payable in monthly installments of one thousand dollars each." In addition to the specific benefits above alluded to, the regulations declared that: "The hospitals of this department are open at all times for the reception of sick and injured employees and members of their families. The treatment therein shall be free of expense to the employee, other than the monthly assessments" which he undertakes to pay into the general relief fund; "but for care and treatment of members of their families, actual cost will be charged, with an addition of ten (10) per cent." The regulations further provided that: "Membership will be voluntary on the part of agents receiving commissions only, and employees who entered the service prior to July 1st, 1896, and have been continuously therein since that date. All persons in service on or after July 1st, 1896, or promoted therein, must, as a condition of employment or advancement, become full members of the department, entitled to all its benefits, before being permitted to go on duty, with the exceptions noted above." "To entitle an employee to participate in any of the forms of relief afforded by the department," he was required to execute a prescribed form of application and "pass a satisfactory medical examination." "In the event of disability or death from accidental injuries," the stipulated benefits were payable only upon compliance with the express condition that "there be first filed with the Superintendent and Chief Surgeon of the Relief and Hospital Department releases satisfactory to him, releasing" each and all of the several companies constituting the Plant System "from all claims for damages by reason of such injury or death, signed by all persons who might bring suit for such damages, or those legally competent to release for them, and by the beneficiaries named in the respective applications. In case a suit for damages should be filed against any of these companies by a member, his beneficiary, or legal representative, with a view to recovering "damages on account of the injury or death of such member," all claims to benefits were thereby to become forfeited, "unless such suit be discontinued and all costs incurred by the defendant therein paid by the plaintiff before any hearing or trial, on demurrer or otherwise."

On and prior to July 1, 1896, Albert Petty was in the service of the Brunswick & Western Railway Company. Although it was not obligatory upon him to do so, on the 22d of that month he applied for membership in the "Relief and Hospital Department." In his application, which was in the form prescribed by the rules of that department, he agreed to become bound by all its regulations, then of force or thereafter adopted, and consented that $1.25 of his wages should be monthly applied, in advance, as a contribution to its relief fund. He further agreed that his application, when duly accepted, should constitute a contract between himself and each of the several companies forming the Plant system, and that, "in consideration of the contribution of said companies to the Relief and Hospital department, and of the guarantee by them of the payments of the benefits aforesaid, the acceptance of benefits from the said Relief and Hospital Department, either money or medical or surgical attendance, for injury or death [should] operate as a release of all claims against said companies, and each of them, for damages by reason of such injury or death, which could be made by or through" him. Another clause recited that it was understood and agreed "that this application, when accepted by the Superintendent and Chief Surgeon, [should] constitute a contract between [the applicant] and the said companies, and each of them, by which [his] rights as a member of said Relief and Hospital Department and as an employee of said companies, or either of them, [should] be determined as to all matters within its scope." Petty's application for membership was duly accepted, and a certificate was issued and delivered to him, by the terms of which he was entitled to the following "benefits provided by the regulations of the Relief and Hospital Department for a member of Class A, to wit: $500.00 in case of accidental death in discharge of duty; $250.00 in case of death from natural causes or injury off duty; $—.50 per day for accidental injuries on duty (not including Sundays) for first 26 weeks; $—.25 for accidental injuries on duty (not including Sundays) after first 26 weeks; $—.50 for sickness per day (not including first six working days or Sundays) for 52 weeks; and free medical and surgical attendance by com-

pany's surgeons and free care and treatment in company's hospitals." On one or more occasions thereafter, Petty availed himself of the rights thus accorded to him as a member of the department and received the benefits to which he was, as such, entitled. He remained in the service of the Brunswick & Western Railway Company until September 19, 1897. In the following year he brought an action for damages against that company, alleging in his petition that on May 12, 1897, while in the discharge of his duties as a switchman, he sustained personal injuries occasioned by the negligence of one of the company's employees. To this action the defendant pleaded, as a special defense, the contract which Petty had made with the Relief and Hospital Department of the Plant System, alleging that, soon after he received the injuries complained of, he voluntarily elected to accept the benefits thus provided for, and actually received not only medical and surgical treatment and attendance but also various sums of money, thereby fully discharging and releasing the defendant company from all liability in damages on account of the alleged injuries sustained by him on the date mentioned in his petition. Petty met this special defense by a demurrer based on various grounds, but it was overruled by the court, and the case proceeded to a trial upon its merits. At the conclusion of the evidence submitted pro and con, the court directed a verdict in favor of the railway company. The present bill of exceptions assigns error both upon the overruling of the plaintiff's demurrer and upon the refusal of the court to grant him a new trial upon each of the several grounds contained in his motion therefor. Such other facts as are essential to an understanding of the questions thus presented for our consideration will be stated in immediate connection therewith in the discussion which follows.

1. One of the main points raised by the plaintiff's demurrer and strenuously insisted upon in the argument here was, that the contract upon which the defendant company predicated its defense was void because contrary to public policy, in that it evidenced an attempt to exempt the company from liability for negligence. In support of this contention, the plaintiff relied on section 2613 of the Civil Code, which declares that: "All

contracts between master and servant, made in consideration of employment, whereby the master is exempted from liability to the servant arising from the negligence of the master or his servants, as such liability is now fixed by law, shall be null and void, as against public policy." As should be readily apparent, the weakness of this position lies in the fact that it is based upon an entire misconception of the meaning and effect of the contract thus assailed. It did not, as claimed, in any of its terms or conditions stipulate that the defendant company should be absolved from the legal consequences of its own negligence or that of its servants. On the contrary, it merely provided an additional remedy to that given by law to an employee who might suffer injury by reason of the negligence, actual or imputable, of his master. The latter remedy was left intact, undisturbed and unimpaired, and the injured employee might, or might not, at his option, take advantage thereof. True, he could not avail himself of both, but was put upon his voluntary election as to which of the two he would pursue. This feature of the contract is not only technically permissible, but is in perfect harmony and accord with that fundamental rule of law, based upon sound and sensible considerations of public policy, which contemplates that indemnity, rather than the mere chance of speculative gain, should be the primordial purpose of every contract designed to afford protection to a party thereto in the event he sustains loss or injury. Only in case the injured employee commits an error of judgment in determining whether he will accept benefits which, though comparatively small, are yet sure and easily within his grasp, or will hazard the less certain result of a suit for damages, can he possibly fail to realize all the fruits of every right given him by law. That it is conceivable he may make such a mistake does not render the contract essentially and inherently vicious, and therefore opposed to public policy. A much more extended argument on the line just suggested might be presented, but we deem it wholly unnecessary. The question under discussion is not a novel one, but has been heretofore thoroughly sifted, minutely analyzed, and satisfactorily determined by a number of the ablest courts of this country. For further light there-

on, we refer those entertaining unsatisfied doubts to the following adjudications, wherein the whole subject, in all its various phases, has been fully and exhaustively dealt with:   Eckman v. Railroad Co., 169 Ill. 312, 38 L. R. A. 750, 9 Am. & Eng. R. R. Cas. (new series) 308; Johnson v. Railroad Co., 163 Pa. St. 127; Ringle v. Railroad Co., 164 Pa. St. 529, 44 Am. St. Rep. 628; Fuller v. B. & O. Employes' Relief Assn., 47 Md. 433; Spitze v. Railroad Co., 75 Md. 162; Lease v. Pennsylvania Co., 10 Ind. App. 47; Pittsburg Ry. Co. v. Moore, 152 Ind. 345, 44 L. R. A. 638 ; P., C. C. & St. L. Ry. Co. v. Cox, 55 Ohio St. 497, 35 L. R. A. 507; Donald v. Railway Co., 93 Iowa, 284, 33 L. R. A. 492; Maine v. Railroad Co., (Iowa) 70 N. W. Rep. 630; Chicago R. R. Co. v. Bell, 44 Neb. 44; Chicago R. R. Co. v. Curtis, 51 Neb. 442, 66 Am. St. Rep. 456; Johnson v. Railway Co., 55 S. C. 152, 44 L. R. A. 645 ; Owens v. Railroad Co., 35 Fed. Rep. 715; State v. Railroad Co., 36 Fed. Rep. 655; Otis v. Pennsylvania Co., 71 Fed. Rep. 136; Shaver v. Pennsylvania Co., Ibid. 931.

2. The plaintiff, by his demurrer, urged, as further objections to the company's special defense, that the contract relied on was without "any good or valuable consideration given or promised by defendant to the plaintiff," and no "mutuality of contract or agreement between" them was thereby created.   In neither of these points is there any merit.   This conclusion is in accord with the decisions rendered in several of the cases above cited, wherein identically the same questions were raised and judicially passed upon after much apparently careful and patient consideration.   Certainly the contract contemplated that Petty was to receive substantial benefits from some source, and accordingly there was a valuable consideration moving to him.   As matter of fact, the defendant railway company contributed largely to the relief fund out of which he was to receive such benefits, upon the express condition that it was to be protected by such contracts as the Relief and Hospital Department might make with its members; and in his application for membership therein, Petty stipulated and agreed that, if accepted, it should constitute a contract between himself and all the companies connected with the Plant system, one of which

was the defendant company. It further obligated itself to join with the other companies in making up any deficit in the relief fund which might at any time occur, and to guarantee the payment of all benefits to which the members were entitled. Petty, in consideration of the nominal contribution made by him monthly and the covenants contained in his application for membership, got the benefit of this guarantee and acquired the right to participate in the enjoyment of the funds which this company and its associates annually paid into the treasury of the department. As was pertinently remarked by Spear, J., when dealing with the same topic in Railway Company v. Cox, 55 Ohio St. 516, cited supra: "The promises are concurrent and obligatory upon both; both promise and both pay in consideration of promises and payment by the other; and the fact that third persons are interested does not impair the force of the obligation. If these stipulations do not supply consideration, it would be difficult to frame such as would; and there being express assent to the terms of the contract by both parties, the element of mutuality is not wanting."

3. All the facts necessary to an understanding of the general character and scope of the operations of the Relief and Hospital Department, as well as the objects for which it was established and was being conducted, were succinctly set forth in the 17th paragraph of the defendant's answer. Nevertheless the court was asked to strike that paragraph, because the allegations therein contained failed "to show whether the Relief & Hospital Department of the Plant System of Railways [was] a copartnership, a corporation, or a mutual benefit association; and, if a corporation, when and where chartered." As it was not alleged to be a corporation, surely it was not incumbent on the defendant to state when and where it was chartered. Under the facts presented, it was really immaterial whether this organization was, as matter of law, "a copartnership, a corporation, or a mutual benefit association;" for, by his demurrer, Petty necessarily admitted that he had become a member thereof and had thereby recognized its right to make a lawful contract, and was not, therefore, in a position to question its authority to transact the business in which it was engaged,

43

especially after he had received the fruits of the contract which it had made with him, as he also by his demurrer admitted to be true.    Eckman *v.* Railroad Co., 169 Ill. 312, 322.    A similar application of the doctrine of estoppel has heretofore been expressly recognized by this court as eminently proper, both in the case of *Planters' & Miners' Bank* v. *Padgett*, 69 *Ga.* 159, and in that of *Imboden* v. *Mining Co.*, 70 *Ga.* 86.    The association styled the "Plant System Relief and Hospital Department" may, possibly, be conducting a general mutual benefit insurance business without a charter and without the least shadow of right, but this is a matter as to which the State alone is concerned.    As it is not attempting to engage in a business without the pale of the law, it stands upon the footing of a de facto corporation, at least.    *Georgia Southern & Florida R. R. Co.* v. *Trust Co.*, 94 *Ga.* 306, 313 et seq.    The association itself would certainly be estopped, under the circumstances, from setting up its want of authority to engage in the business carried on by it, and thus repudiate its solemn engagements to its members.    *Georgia Ice Co.* v. *Porter*, 70 *Ga.* 637.    This being so, it was not essential to the protection of Petty that he should be allowed to raise, by demurrer or otherwise, any issue partaking of the nature of a plea of nul tiel corporation.

4. Before entering upon a discussion of the merits of the case, as disclosed by the evidence introduced at the trial, it is proper to briefly refer to a question of practice which, although repeatedly ruled upon by this court, was wholly disregarded by counsel for plaintiff in drafting his motion for a new trial.    In the 6th ground thereof, complaint is made that certain documentary evidence, therein referred to as " contained and indicated in the brief of evidence as Exhibits No. 1, No. 2, and No. 5," was admitted over various specified objections urged by him at the trial.    We take occasion to again repeat that, as was explicitly announced in each of the cases cited below, a ground of a motion for a new trial which does not set forth, literally or in substance, the evidence therein alleged to have been illegally admitted, can not be considered by this court.    *Western Union Telegraph Co.* v. *Michelson*, 94 *Ga.* 436 ; *Rucker* v. *State*, 97 *Ga.* 205 ; *Baker* v. *State*, Ibid. 452 ; *Moncrief* v. *State*, 99 *Ga.* 395 ;

*Herz* v. *Claflin Co.*, 101 *Ga.* 615; *Huie* v. *McDaniel*, 105 *Ga.* 319; *Reinhart* v. *Blackshear*, Ibid. 799; *Pearson* v. *Brown*, Ibid. 802; *Taylor* v. *State*, Ibid. 847. The only remaining special ground of the plaintiff's motion relates to the direction of a verdict. Error is assigned upon the action thus taken by the court, (1) because, as counsel earnestly contends, there was evidence to warrant a finding by the jury that Petty, "being illiterate and unable to read or write, did not have fully explained to him and read over to him the said relied upon and alleged contract," and accordingly did not voluntarily and understandingly assent to its conditions respecting the release of the defendant company from liability; and (2) this contract being, at most, "purely an agreement of accord and satisfaction," the jury should have been allowed to say whether, under the evidence adduced at the trial, "there had been a full and complete accord and satisfaction" as matter of fact. The case really turns upon a proper determination of these two all-important questions. We shall deal with them separately, in the order in which they are presented.

5. As a matter of course, if Petty was by any artifice or fraudulent misrepresentation on the part of the defendant company or its agents induced to sign a contract the terms and conditions of which he did not understand and voluntarily assent to, the same would not be legally binding upon him, and he would be at liberty to repudiate it at pleasure, provided he offered to restore to the opposite party all fruits received by him thereunder. *East Tennessee Ry. Co.* v. *Hayes*, 83 *Ga.* 558. In the present instance, no such offer was made or excuse suggested why this eminently just and reasonable requirement of the law was not complied with before bringing suit. The position taken by Petty at the trial was, that he had a right to retain all the fruits received by him under his contract, ratifying the same to this extent, but repudiating it in so far as his own obligations thereunder were concerned. That is to say, he claimed the privilege of being arbitrarily inconsistent — a privilege which can not, of course, be properly conceded to any litigant. Nevertheless, in support of this position, counsel rely upon the case of *Butler* v. *Railroad Co.*, 88 *Ga.* 594. There it appeared that

the plaintiff "sought to make the question that the written instrument in the form of a receipt and release which the company produced, showing on its face an accord and satisfaction touching the cause of action declared upon, was procured from him by fraud. The instrument was signed with his mark, and he denied that he ever entered into such a contract or that the same was read over to him. He admitted that the amount specified as paid to him was paid, but denied that it was paid on any such contract. He contended that it was paid upon his claim for wages, and that in signing the instrument he thought he was subscribing to an ordinary pay-roll only." In other words, his grievance was, "not that he was induced by fraud to enter into a contract, but that a fraudulent advantage was taken of him by procuring his signature to a writing which [purported] to set forth a contract into which he never entered. On his theory, the money he received was no fruit of such a contract, and could not have been, because none such was ever made." Accordingly, it was held that, taking as true his version of the transaction, he really received "nothing which he ought not to have had independently of any agreement, fraudulent or not fraudulent, touching his claim for damages on account of the personal injury sued for," but merely what, so far as appeared, he was strictly entitled to under another and entirely distinct claim against the company, the contract of settlement concerning which the writing did not truly and correctly set forth, but actually misrepresented. Clearly, under such circumstances, it was not incumbent upon the plaintiff, as a condition precedent to bringing his action for personal injuries, to offer to restore the fruits of a settlement of an entirely distinct claim which he had in good faith accepted and was undoubtedly entitled to retain, notwithstanding the alleged fraud perpetrated upon him in procuring him to sign a release wholly different from that which he had agreed to execute.

In the present case, it was not shown that the plaintiff had any claim whatever against the company other than that growing out of the injury he alleges he sustained while in its service. He knew that the benefits he accepted were the fruits of the contract he now seeks to repudiate. Upon this point, he

himself testified as a witness in his own behalf : "I got treated for this trouble by Dr. Blanton, and was also furnished medicines; they gave that to me ; I had been paying money to that hospital department for it. . . I did join the Relief & Hospital Department. I signed my name to some papers to join that department. . . At the time I took these several small amounts from Mr. Verdery [the company's cashier], I thought they were for my half wages during the time I was hurt and laid off. My understanding was, that, if I got hurt, they would pay me half wages during the time I was laid off, and give me my medical attention. That is what I thought I was paying my dollar and a quarter a month for. I sure didn't take them understanding that it would be a release of the railroad for the payment of damages; I would not have taken them if I had known that was what they were aiming at. . . I knew I was being paid for the time I was laid off; I did not think they was just giving me the money just to be generous ; I had been paying my dollar and a quarter every month, and I surely expected to get my benefit when I was damaged ; I didn't expect just to pay my money in there and not get any insurance out of it when I got hurt ; that was what I understood,—that if I would give them that dollar and a quarter a month, they would give me half pay for my lost time and my medicines and doctor's bills. I was treated by Dr. Blanton, and I didn't pay anything for it except my dollar and a quarter a month ; I got this treatment and that money under my contract with the Relief & Hospital Department." Each of the several vouchers which Petty signed with his mark and presented to the company's cashier recited that the amount therein specified was "in payment of benefits due from" that department, and was "paid and accepted under the regulations" thereof. Petty did not undertake to charge that any of the company's agents in any manner misrepresented the contents of these writings or by their conduct led him to believe that payment was made on any different claim than therein specified. Indeed, his sole complaint in this connection is, that the company's cashier paid the orders drawn on him without any comment whatever, and neither he nor any other agent of the defendant volunteered

to explain that, under Petty's written contract with the Relief & Hospital Department, the acceptance of any of the benefits provided for under its regulations would have the legal effect of releasing the defendant company from all claims for damages growing out of the particular injury for which compensation was thus made.

We gather from the plaintiff's testimony, construed most favorably to him, that he really was ignorant of the terms and conditions embraced in that contract, and never did grasp and fully comprehend its precise character, import, or practical effect. But certainly this was the result of no fraudulent act of commission on the part of the company's agents, as the record before us clearly discloses; and it would seem that if any unconscionable advantage was gained by the company through the omission of its agents to read over to Petty and explain to him the precise meaning of the written contract into which he was called upon to enter as a condition precedent to becoming a member of the Relief & Hospital Department, he by his conduct really misled them into the belief that he fully understood the terms and effect of the contract, and subsequently allowed that impression to remain by the readiness he displayed in acquainting himself with all his rights in the premises and the uniform promptness with which he asserted his claim to all benefits accruing to him thereunder. He did, in contradiction to positive testimony to the contrary, swear that when he "joined this hospital department, nothing at all was said to [him] as to what effect [his] joining it would have upon [his] right to recover for any injuries sustained by" him, and "no explanation of the contract was given;" but what he "understood was, that all employees of the road had to belong to it and that they had to join," as he was told by "a little low chunky man" who, it is fair to infer from other evidence appearing in the record, was none other than Dr. Caldwell, the Superintendent and Chief Surgeon of the relief department, who witnessed the execution of the contract signed by Petty. The latter did not, however, undertake to deny the sworn assertion of Dr. Caldwell and other witnesses introduced in behalf of the company, to the effect that, before Petty was called upon to sign the in-

strument, he was asked particularly if he fully understood its meaning, and answered in the affirmative. His omission to meet this important testimony is significant in view of the fact that he was thereafter recalled to the witness stand and was thus afforded a full opportunity to do so, if he could truthfully testify to the contrary. In a case very similar, upon its facts, to that now before us, the Court of Appeals of Maryland, in discussing an attempt by a railroad employee to repudiate a written contract signed by him, on the ground that "he could not read English" and "believed he was signing a receipt . . and nothing more," held that "A person who executes, without coercion or undue persuasion, a solemn release under seal, can not subsequently impeach it on the ground of his own carelessness, when at the time of its execution he might, had he seen fit, have advised himself fully as to the nature and legal effect of what he was doing." See Spitze v. Railroad Co., 75 Md. 162. This ruling was put upon the distinct ground that: "Such person can not invoke his own heedlessness to impeach his solemn release, and then call that heedlessness some one else's fraud. If he did not know what he was signing, it was his plain duty to inquire. He had no right to act as one who understood what he was doing, unless he intended to lead those with whom he was dealing to believe that he did understand the act that he did." The common justice of the rule thus announced appeals to us strongly. However, we place our decision in the case at bar upon the incontrovertible ground that the same does not fall within the letter or the spirit of the ruling made in Butler v. Railroad Co., supra, and therefore, if Petty desired to rescind his contract on the plea of fraud, it was incumbent upon him to unreservedly make such election and offer to yield up the benefits he accepted thereunder, if within his power; or, if not, to treat it as binding upon him to the extent of releasing the company from liability to respond in damages for his alleged injury, though not effectual to cut off his right to sue in tort because of the fraud claimed to have been perpetrated upon him in procuring his signature thereto. It is to be noted, in this connection, that the distinction here made between Butler's case and one like the present was also pointed out and applied

in *W. & A. R. R. Co.* v. *Burke,* 97 *Ga.* 560, the decision in which controls the case at bar upon this point.

6. It may be true, as contended by counsel for the plaintiff in error, that a jury would have been authorized, under the evidence submitted in his behalf, to find that he did not actually receive all the benefits to which he was entitled as a member of the Relief and Hospital Department. It does not follow, however, that for this reason his action for damages had any standing in court. We do not agree with counsel that the contract relied on by the company was "purely an agreement of accord and satisfaction" which, not having been fully complied with on its part, did not operate to extinguish the plaintiff's cause of action, notwithstanding he had voluntarily accepted the major part of the satisfaction to which he was thereunder entitled. Unquestionably, as was said by Chief Justice Bleckley in *B. & W. Ry. Co.* v. *Clem,* 80 *Ga.* 539: "As long as the accord is executory, although it is partially performed, the original cause of action is not extinguished, and an action may be brought upon it, and the remedy for the defendant is to plead his part performance as satisfaction pro tanto. He gets credit for all he has paid upon it, but the right of action is not extinguished by an accord merely, without complete satisfaction, where the parol contract is that performance, not mere promise, is to constitute the satisfaction; [though] if a promise is to constitute it before performance, then the accord is executed by the promise." But the application of this rule to the facts of the present case which counsel invites us to make would not be justified by anything contained in the written instrument now under consideration. Petty therein expressly stipulated that acceptance by him from the Relief and Hospital Department of any of the benefits provided for by its regulations should operate, without more, to release the defendant company from all claims for damage he might have against it. In other words, the contract put him upon his election to look solely either to the treasury of that department or to the assets belonging to the company, for compensation in the event he sustained injury under circumstances which he thought entitled him to redress from it; and the moment he

gave evidence of his election by proceeding against and actually receiving benefits from the department, he necessarily relinquished his right to call upon the company for anything; for it was mutually agreed between him and the company that such conduct on his part should be conclusive evidence of his acceptance of the department's obligation to pay him stipulated benefits, which obligation was expressly conditioned upon his first fully releasing the company from all liability. It is to be remembered that one of the regulations of the relief department was that, "in the event of disability or death from accidental injuries," none of the benefits therein provided for should "be payable or paid until there be first filed" a satisfactory release of that character. Under those circumstances, the department made to its members only a conditional promise to pay. To secure an unconditional promise, it was necessary to release the company. The release was not itself to be conditioned upon a fulfilment of the promise, but was to be the consideration supporting such promise, tendered and parted with in advance in order to make the promise itself obligatory. The sum and substance of Petty's agreement, therefore, was that the mere promise of the department should constitute a full accord and satisfaction of his claim against the company, in the event he elected to avail himself of such promise in lieu of prosecuting his action against the company; and this being so, he certainly can not be heard to urge that full performance, rather than bare promise, was what was contemplated by all parties concerned.

7. That we may not be understood as inadvertently overlooking or deliberately ignoring any of the questions presented by counsel for the plaintiff in error on the argument here, we will briefly allude to their further contention that the contract by which the several corporations belonging to the Plant System undertook to obligate themselves to donate money to the Relief and Hospital Department, assume the management of its affairs, and guarantee the discharge of its obligations to its members, was ultra vires, because its object was entirely foreign to the purposes for which railroad companies are usually chartered. In the first place, this question is not properly

raised by any of the special grounds of the motion for a new trial, nor is there in the bill of exceptions the faintest suggestion that the same was ever presented to and passed upon by the court below. Furthermore, a patient examination of the record before us discloses that no evidence whatever as to the nature and extent of the charter powers of any of these corporations was introduced at the trial. The silence of the record in this regard indicates either that this important issue was not raised at all, or else that the plaintiff signally failed to establish his contention by competent evidence, as it clearly was incumbent upon him to do. This being so, we can not, of course, undertake to arbitrarily assume that the corporations just referred to exceeded their charter powers when they entered into the contract which the plaintiff claims was ultra vires. Although it would seem that this self-evident proposition is capable of standing alone, unsupported by authority, an adjudication directly in point is not wanting. See Chicago R. R. Co. v. Bell, 44 Neb. 44.

On the whole, we conclude that counsel came to the assistance of the plaintiff too late to render him any effectual aid or comfort on the lines upon which his case was conducted.

*Judgment affirmed. All the Justices concurring.*