WASHINGTON *v.* ATLANTIC COAST LINE RAILROAD COMPANY *et al.*

CHANDLER *v.* ATLANTIC COAST LINE RAILROAD COMPANY *et al.*

1. The provision of the railroad employers' liability act of August 16, 1909, embodied in the Civil Code (1910), § 2785, applied to the case of an employee who joined the relief department of a railroad company prior to the passage of such act, and agreed that the acceptance by him from

such department of benefits "for injury" (to which department he and other members contributed, as well as the railroad company) should operate as a release and satisfaction of all claims against the company, and that the bringing of a suit for damages should forfeit all rights to benefits, but who was injured by reason of the negligence of a co-employee after the passage of the act, and who accepted certain benefits from the relief department.

2. As applied to such a case, the provision of the act referred to in the preceding headnote, to the effect that the acceptance of benefits should not release the employing railroad company from liability, but in case of recovery the employer might set off any sum it had contributed or paid to any relief or benefit which may have been paid to the injured employee on account of the injury, is not violative of article 1, section 3, paragraph 2, of the constitution of this State, which provides that no law impairing the obligation of contracts shall be passed.

3. The above-mentioned act is not violative of the fourteenth amendment to the constitution of the United States, on the ground that it abridged the privilege of the railroad company to contract, or deprived it, or its relief department, of the liberty of contract, without due process of law.

                          AUGUST 15, 1911.

The Court of Appeals certified to the Supreme Court the following questions:

1. A railroad company prior to the year 1909, with the co-operation of certain of its employees, organized what is called the relief department for the payment, to such of its employees as became members (or to their families), of monetary benefits in case of illness, accidental injury, or death, and for that purpose a fund known as the relief fund was raised, said relief fund, under the regulations adopted, consisting of "contributions from members, income derived from investments and from interest paid by the company, and advances by the company when necessary to pay benefits as they become due." The contributions of the members were certain stipulated sums deducted from their wages each month by the company. The company had general charge of the relief department, guaranteed the fulfilling of its obligations, and paid the operating expenses thereof, holding the moneys of the relief fund in trust for the department, and paying interest thereon at the rate of 4% per annum. The company also agreed, that, "if the amount contributed by the members to the relief fund, with interest and other income, shall not be sufficient to pay the benefits as they become due, the company shall advance from its own funds whatever sums may be necessary for this purpose, reimbursing itself if and when the contributions of members with interest and other income are

sufficient therefor." An employee of the company, in becoming a member, made the following agreement as a part of his application : "In consideration of the amounts paid and to be paid by said company for the maintenance of said relief department, and of the guarantee by said company of the payment of said benefits, the acceptance by me of benefits for injury shall operate as a release and satisfaction of all claims · against said company; . . and further, if any suit shall be brought against said company, or [any] other company associated therewith as aforesaid, for damages arising from or growing out of injury or death occurring to me, the benefits otherwise payable, and all obligations of said relief department and of said company, created by my membership in said relief fund, shall thereupon be forfeited without any declaration or other act by said relief department or said company." Each member agreed to be bound by the regulations, one of which provided that "in case of injury to a member he may elect to accept the benefits in pursuance of these regulations, or to prosecute such claims as he may have at law against the company or any companies associated therewith in the administration of their relief departments." (A full copy of the application, contract, and regulations are incorporated in the record herewith transmitted, to which reference may be had for further details, if necessary.) An employee of the railway company in question made application and became a member of the relief department in 1906, and in December, 1909, was hurt through the negligence of another employee of the railway company, who stood to him in the relation of fellow servant. The injured employee brought suit against the company and the fellow servant. It appears that he had accepted a certain portion of the benefits due him from the relief department on account of his injury, and that the railway company had contributed a certain part of the money so paid him. Did the fact that he had accepted these benefits operate to release the defendants, or do the provisions of the act of August 16, 1909, embodied in Civil Code (1910), § 2785, apply, so that thereunder the defendant was entitled merely to diminish the amount of the plaintiff's recovery by a set-off of the sum it had contributed to the benefit paid to the plaintiff?

2. If it be held that the statute referred to in the preceding question is applicable as indicated therein, then is said statute unconstitutional as being violative of art. 1, sec. 3, par. 2, of the

constitution of Georgia (Civil Code (1910), § 6389), which provides that no law impairing the obligation of contracts shall be passed, and because, as applied to the case at bar, the facts of which are indicated in the preceding question, it impairs the obligation of the contract between the plaintiff and the defendant, whereby the plaintiff agreed, in becoming a member of the relief department, that acceptance of the benefits in case of injury should release the defendant from all liability on account of said injury?

3. If it be held that the statute referred to in the first question is applicable to the state of facts presented and therein indicated, is the statute violative of the 14th amendment to the constitution of the United States, on the alleged ground that it abridges the privileges of the railway company to contract, or on the alleged ground that it deprived the railway company and its relief department of their liberty without due process of law, in that it deprives them of the liberty to make the contract in question?·

The foregoing questions were certified in the case of Washington. The same questions were certified in the case of Chandler, except that it was stated that the employee became a member of the relief department in July, 1909, and was injured in October, 1909, after the passage of the act of August 16.

*Osborne & Lawrence, Crawley & Crawley, Robert L. Berner,* and *John G. Walker,* for plaintiffs in error.

*P. W. Meldrim, Shelby Myrick, Bennet, Twitty & Reese,* and *Wilson, Bennett & Lambdin,* contra.

LUMPKIN, J.  These two cases were argued together. Three questions are raised: (1) Does the fourth section of the act of 1909, embodied in Civil Code, (1910), § 2785, apply to the character of relief arrangement or agreement and the state of facts described in the first question of the Court of Appeals?  (2)  If so, is that section unconstitutional as violating the clause of the constitution of this State which declares that no law impairing the obligation of a contract shall be passed (Civil Code (1910), § 6389)?  (3)  If such statute is applicable, is it violative of the fourteenth amendment to the constitution of the United States, on the ground that it abridges the privilege of the railroad company to contract?  We will take up these questions in the order stated.

1. Does section 2785 of the Civil Code of 1910 apply to the facts of this case, stated in the first question of the Court of Ap-

41

peals? That section reads as follows: "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by the three preceding sections, shall, to that extent, be void: Provided, that in any action brought against any such common carrier, under or by virtue of any of said sections, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief, benefit, or indemnity that may have been paid to the injured employee, or, in the event of death, to the person or persons entitled thereto on account of the injury or death for which said action is brought." The three preceding sections contain, in brief, the following provisions: Section 2882 provides that every common carrier by railroad shall be liable in damages for a personal injury to any of its employees resulting in whole or in part from negligence of its officers, agents, or employees, or from defects or insufficiency in its engines, cars, machinery, road, works, or other equipment, due to its negligence. It declares who may sue in case of death; and that there should be no recovery, if the injured person brought about his injury by the failure to use ordinary care, or if he could have avoided the consequences of defendant's negligence by the use of ordinary care. It also deals with the question of presumption. Section 2783 applies the doctrine of comparative negligence and diminution of damages to the case of an injured employee. Section 2784 declares that the doctrine of assumption of risks of employment shall not apply where the violation by the common carrier of any statute enacted for the safety of the employees contributed to the injury or death.

It was contended that section 2785, when considered together with the other sections mentioned, did not cover a case like the one stated in the question propounded to us. We can not acquiesce in this contention. The main purpose of the act was to enlarge the liability of common carriers by railroad for damages to employees, and to declare that certain things which previously would have prevented a recovery should not thereafter do so. One of these was the character of arrangement here involved.

A glance at the legislation in this State on the subject of recoveries for injuries to the persons of railroad employees will throw light on the legislative intent. Under the act of 1856, as codified in section 2980 of the Code of 1863, it was declared: "If the per-

son injured is himself an employee of the company, and the damage was caused by another employee, and without fault or negligence on the part of the person injured, his employment by the company shall be no bar to the recovery." This made a change in the common-law rule. Thereafter contracts were made by which railroad employees assumed the risks of their employment. It was held that they were binding, except as against damages resulting from criminal negligence. By the act of 1876 the definition of criminal negligence, as applied to employees of railroads, was greatly enlarged. Acts 1876, p. 111; Penal Code (1895), § 115.

By the act of 1895 (Acts 1895, p. 97; Civil Code of 1895, § 2613), it was declared: "All contracts between master and servant, made in consideration of employment, whereby the master is exempted from liability to the servant arising from the negligence of the master or his servants, as such liability is now fixed by law, shall be null and void, as against public policy." Here, then, prior to the act of 1909, was a prohibition against contracts whereby the master was exempted from liability to the servant arising from the negligence of the master or his other servants. But a new arrangement was made, which was called a relief department. The employees of the railroad company who became members had certain amounts deducted from their wages to go to the relief fund. The company had general charge of the department, paid amounts for the maintenance of the relief department, and guaranteed the payment of the benefits provided to be paid. There was no direct agreement to release the company from liability for negligence; but if an injured employee took the benefits arising in part from his own contributions and those of his coemployees, he forfeited any right to hold the company liable. If he sued the company, he forfeited any claim for benefits or relief. It is unnecessary to discuss the merits or demerits of this system. Suffice it to say that, under its operation, the employee was put upon his election. Whichever way he elected, he released or forfeited something.

In this state of the law, it was held that such an agreement was not illegal. *Petty* v. *Brunswick & Western Ry. Co.,* 109 *Ga.* 666 (35 S. E. 82). There was no intimation that the legislature could not change the law. They did change it, and passed the act of 1909, which is quoted above. If that act was not intended to apply to the situation here involved, it is difficult to say what was

intended. If it only dealt with a direct contract to relieve an employer from liability, it added nothing to the law as it already stood, and was mere surplusage. If there were any doubt as to the effect of the general words in the beginning of the section, the statement as to setting off any sum contributed or paid by the common carrier to any "insurance, relief, benefit, or indemnity" shows clearly that such arrangements were included in the legislative intent. In 2 Lewis' Sutherland on Statutory Construction (2d ed.), § 347, pp. 663-4, it is said: "The inquiry, where any uncertainty exists, always is as to what the legislature intended, and when that is ascertained it controls." And in the same volume, on page 672, it is said: "The exception of a particular thing from the operation of the general words of a statute shows that in the opinion of the lawmaker the thing excepted would be within the general words had not the exception been made."

To the first question propounded by the Court of Appeals we answer that the act of 1909 applies to the present cases; so that acceptance of benefits did not operate to release the defendant company, but entitled it to diminish any recovery which might be had, as in the act provided.

· 2. The second question is whether, as applied to the state of facts set out in the first question, the act of 1909 is violative of article 1, section 3, paragraph 2, of the constitution of the State, which provides that no law impairing the obligation of contracts shall be passed. The question is an important one. The constitution of the United States contains a similar declaration to that contained in the State constitution, though the latter only is here invoked. The Federal employers' liability act of 1908 contains a clause like that in the legislative act of 1909 which is under consideration. Other States have enacted similar laws. As both a theoretical and a practical question, it is one of great interest.

The injured employee became a member of the relief department of the railway company in 1906. The act of the legislature under discussion was approved August 16, 1909. The employee was injured in December, 1909. Thereafter he accepted a certain portion of the benefits due him from the relief department. The railway company had contributed a part of the money from which such benefit payments were made.

In Boston and Maine R. Co. *v.* County Commissioners, 79 Me.

386 (10 Atl. 113), although the charter of a railroad company provided that it should not be altered, amended, or repealed, it was held that an act requiring the expense of building and maintaining a highway where it crossed a track at grade should be borne by the railroad company was a legitimate exercise of the police power, and was constitutional. Emery, J., said: "This power of the legislature to impose uncompensated duties, and even burdens, upon individuals and corporations for the general safety, is fundamental. It is the 'police power.' Its proper exercise is the highest duty of government. The State may in some cases forego the right to taxation, but it can never relieve itself of the duty of providing for the safety of its citizens. This duty, and consequent power, override all statute or contract exemptions. The State can not free any person or corporation from subjection to this power. All personal as well as property rights must be held subject to the police power of the state. . . This important power must be extensive enough to protect the most retiring citizen in the most obscure walks, and to control the greatest and wealthiest corporations. Its exercise must become wider, more varied and frequent, with the progress of society."

In Coates v. Mayor etc. of New York, 7 Cow. 585, interments of the dead were made in a certain part of the city of New York by persons having a right under grants of, or titles to, land held in trust for the sole purpose of interment, some of which land had been used for that purpose for more than a century, and to some of which certain fees for interment were incident and belonged to the person interring. A further right was also claimed by individual vault owners, in whose behalf some of the interments were made. It was held that an act which authorized the city to make by-laws for regulating or, if found necessary, preventing the interment of the dead was not unconstitutional, either as impairing the obligation of contracts, or taking private property for public use without compensation. In Lindenmuller v. People, 33 Barb. 548, 577, an act of the legislature of New York prohibiting exhibitions of dramatic performances on Sunday was held to be constitutional, as against a claim that the plaintiff in error had leased certain property with a view to its occupancy for the purpose of a Sunday theater. It was added that "The contract with the performers, if one exists, for their service on the Sabbath, stands upon

the same footing." In City of New York *v.* Herdje, 68 App. Div. 370 (74 N. Y. Supp. 104), an act amending the law regulating the construction of tenement houses was upheld as against a contention that plans and specifications had previously been filed and a contract for the construction of the building had been made.

In People *v.* Hawley, 3 Mich. 330, a manufacturer of malt liquors in Michigan entered into a written contract with a firm at Chicago, Illinois, whereby he agreed to sell and forward to the firm all quantities of malt liquors which they might need in their business for five years thereafter. Nineteen days later an act was passed by the legislature of Michigan, prohibiting the manufacture of intoxicating beverages, and the traffic in them. Upon being indicted, the manufacturer set up that the law impaired the obligation of his contract. The Supreme Court of the State held the law valid, and declared, that, in the exercise of its police powers, the State may prohibit the exercise of any trade or employment which is found to be hazardous or injurious to its citizens, and that "Where the exercise of such power operates to prevent the performance of a contract previously made, the same principle applies, and the law is not within the prohibition of the constitution of the United States."

While the clause of the constitution of the United States inhibiting any State from passing a law impairing the obligation of a contract is not invoked in this case, it is substantially the same as that contained in our State constitution, and the construction given to the former will throw light on the proper construction of the latter. In New York etc. Railroad Company *v.* Bristol, 151 U. S. 556 (14 Sup. Ct. 437, 38 L. ed. 269), a law requiring the removal of grade crossings on a railroad was attacked as unconstitutional. It was contended, among other things, that the company could not meet the expense entailed upon it thereunder and have any income left to pay its fixed charges, interest, and dividends on preferred stock, and that it impaired the obligation of the contracts made by the company with the holders of its bonds and preferred stock, by making it impossible for the company to pay the interest on the bonds and dividends on such stock, as it had agreed to do, and also maintain and operate the railroad efficiently. The law was held to be constitutional. In the opinion of the court, delivered by Mr. Chief Justice Fuller, it was said (p. 567); "It is likewise

thoroughly established in this court that the inhibitions of the constitution of the United States upon the impairment of the obligation of contracts, or the deprivation of property without due process or of the equal protection of the laws, by the States, are not violated by the legitimate exercise of the legislative power in securing the public safety, health, and morals. The governmental power of self-protection can not be contracted away, nor can the exercise of rights granted, nor the use of property, be withdrawn from the implied liability to governmental regulation in particulars essential to the preservation of the community from injury." See also Chicago etc. R. Co. v. State, 47 Neb. 549 (66 N. W. 624, 41 L. R. A. 481, 53 Am. St. R. 557) ; Chicago etc. Railroad v. Nebraska, 170 U. S. 57 (18 Sup. Ct. 513, 42 L. ed. 948) ; Beer Company v. Massachusetts, 97 U. S. 25 (24 L. ed. 989) ; Fertilizer Company v. Hyde Park, 97 U. S. 659 (24 L. ed. 1036) ; Chicago etc. Railroad Co. v. Chicago, 166 U. S. 226 (17 Sup. Ct. 581, 41 L. ed. 979) ; Barbier v. Connolly, 113 U. S. 27 (5 Sup. Ct. 357, 28 L. ed. 923) : New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 672 (6 Sup. Ct. 252, 29 L. ed. 516).; Gillam v. Sioux City etc. R. Co., 26 Minn. 268 (3 N. W. 353).

In some of the cases cited, the contract set up arose from the charter of the corporation. In the Dartmouth College case, in the absence of a reservation of a right to alter or withdraw franchises, a charter was held to constitute a contract with the State. In that case, however, it was not held that the police power of the State was destroyed; and in cases cited above the rule that such power may be legitimately exercised, although to some extent it may interfere with the manner of enjoying or using the grants contained in the charter, is asserted.

In New Orleans Gas Co. v. Louisiana Light Co., supra, a legislative grant of an exclusive right to supply gas to a municipality and its inhabitants, through pipes and mains laid in the public streets, and upon condition of the performance of service by the grantee, after performance by the grantee, was held to be a contract within the protection of the constitution of the United States against State legislation impairing the obligation of contracts. Nevertheless, in the opinion, Mr. Justice Harlan said (p. 672) : "The constitutional prohibition upon State laws impairing the obligation of contracts does not restrict the power of the State to

protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such contracts. Rights and privileges arising from contracts with a State are subject to regulations for the protection of the public health, the public morals, and the public safety, in the same sense, and to the same extent, as are all contracts and all property, whether owned by natural persons or corporations."

In Manigault *v.* Springs, 199 U. S. 473 (26 Sup. Ct. 127, 50 L. ed. 274), riparian owners of land entered into an agreement to remove a dam obstructing a creek and to allow the creek to remain open and unobstructed. Later the legislature of South Carolina passed an act, reciting the necessity for draining the low lands of the Santee river, and authorizing the defendants by name to erect and maintain a dam across the creek. It was held by the Supreme Court of the United States that such an act, for the draining and reclamation of swamps and the erection of dams, levees, and dikes for that purpose, was a legitimate exercise of the police power, and was not unconstitutional as impairing the obligation of the previous contract between the parties.

In this State, since the Code of 1863, a law has existed which reserves the right to withdraw corporate franchises, and later a constitutional prohibition against the grant of irrevocable franchises has been added. Code of 1863, § 1636; Code (1910) §§ 6389, 6390. So that the question of irrevocable grants by the State after 1863 does not arise. But authorities on that subject are useful in dealing with the principle involved where such contracts could be made.

It will be seen that the clause of the constitution of the United States inhibiting the States from passing laws impairing the obligation of contracts is not violated by the legitimate exercise of legislative power in securing the public safety, health and morals, and that the governmental power of protection of the people can not be contracted away. This is true of contracts between a State and a corporation or individual, and also of a municipality as to its legislative or discretionary governmental power. *Macon Consolidated Street R. Co.* v. *Mayor and Council,* 112 *Ga.* 782 (38 S. E. 60). "Neither can private individuals and corporations, by entering into contracts among themselves, invoke the contract clause of the Federal constitution for the protection of those con-

tracts to the extent of withdrawing the exercise of rights granted, or the use of property involved, from the implied liability to governmental regulation in particulars essential to the preservation of the community from injury." 9 Enc. U. S. R. 499, and cit.

The expression "police power" is sometimes used in a very broad sense, including all legislation and almost every function of civil government. At other times it is used in a somewhat more restricted sense. The legislature can not arbitrarily prohibit either the making or the carrying out of all contracts, under the claim of exercising police power. Thus it is clear that the legislature could not declare that debtors could satisfy promissory notes by paying less than the amount called for by them, or that such notes should bear a greater or less rate of interest than that included in them, if valid when the contract was made. Other illustrations of contracts beyond the reach of interference by the legislature might be given. At the other extreme stand such contracts as those involved in the liquor and lottery cases above cited. Between these two extremes lies a legal territory where cases must be determined as they arise. No inflexible line can be drawn in advance as a test for the determination of what is a legitimate exercise of the police power of the State which does not conflict with the contract clause of the constitution, and what is an arbitrary interference with the obligation of contracts or with the liberty of contract.

In Iowa a statute was passed which made railway companies liable to employees for damages in consequence of the negligence of their agents or other employees, and declared that no contract which restricted such liability should be legal or binding. By amendment it was added that no contract of insurance relief, benefit, or indemnity in case of injury or death, entered into prior to the injury, and no acceptance of any such relief, insurance, benefit, or indemnity by the person injured, his widow, heirs, or legal representatives after the injury, should constitute any bar or defense to any cause of action brought under the provisions of the act. This act was attacked on the ground that it violated the fourteenth amendment of the constitution of the United States, in that it impaired the liberty of contract. In Chicago etc. R. Co. *v.* McGuire, 219 U. S. 549 (31 Sup. Ct. 259, 55 L. ed.), the constitutionality of the act was upheld. In the syllabus it was said: "A State has power to prohibit contracts limiting liability for injuries,

made in advance of the injury received, and to provide that the subsequent acceptance of benefits under such contracts shall not constitute satisfaction of the claim for injuries received after the contract. Such a statute does not impair the liberty of contract guaranteed by the fourteenth amendment." In the opinion Mr. Justice Hughes said: "In dealing with the relation of employer and employed, the legislature has necessarily a wide field of discretion in order that there may be suitable protection of health and safety, and that peace and good order may be promoted through regulations designed to insure wholesome conditions of work and freedom from oppression. . . The power to prohibit contracts, in any case where it exists, necessarily implies legislative control over the transaction, despite the action of the parties. . . If the legislature may prohibit the acceptance of the promise as a substitution for the statutory liability, it should also be able to prevent the like substitution of its performance" (pp. 570, 572). The power to enact such a law was thus distinctly treated as based upon the fact that it was a legitimate exercise of the police power in the protection and promotion of health, safety, and good order. It was analogized to laws prohibiting the manufacture and sale. of intoxicating liquors, limiting employment in underground mines and smelters to eight hours a day, prohibiting contracts of options to sell or buy grain or other commodity at a future time, and prohibiting the employment of women in laundries more than ten hours a day (p. 568). It is true that in the case cited the employee became a member of the relief department of the railroad after the passage of the act, and that the contention was that the statute conflicted with the fourteenth amendment to the constitution of the United States, and not with the clause in reference to the impairment of the obligation of contracts. But "it has been held that the right to make contracts is embraced in the conception of liberty as guaranteed by the constitution" (p. 566). If so, it can not be arbitrarily destroyed by State legislation. Nevertheless it was held that the statute then under review was a legitimate exercise of the police power of the State, looking to the preservation of the safety of a considerable class of the public, who could be legitimately dealt with as a class, and that the constitutional guaranty of liberty to contract did not prevent the exercise of such police power. See also Louisville etc. R. Co. *v.* Mottley, 219 U. S. 467,

484 (31 Sup. Ct. 265, 55 L. ed.), and citations; Texas etc. R. Co.
v. Miller (U. S.), (31 Sup. Ct. 534, 536).

Statutes changing, as to railroad companies, the general rule
which exempts the master from liability to a servant for injuries
caused by the fault or negligence of a fellow servant have been
upheld by various courts.   The peculiar nature of the business
conducted, the conferring on railroad companies of the power of
eminent domain, the dangers incident to such employment, the
number of people engaged in it, and the necessity for the State
to protect them, have all been advanced as reasons for making a
classification as to such employees, and enacting laws looking to
their safety.   *Georgia Railroad and Banking Co.* v. *Miller,* 90 *Ga.*
571 (16 S. E. 939), and citations; Florida East Coast R. Co. *v.*
Lassiter, 58 Fla. 234 (50 So. 428) ; 19 A. & E. Ann. Cas. 192, and
note.   It is not easy to see how a statute like the one under con-
sideration can be held to be a legitimate exercise of the police
power of the State, looking to the public safety and welfare, or the
safety of a class of the public which may be dealt with as such, and
therefore valid as against a claim that it interferes with the con-
stitutional right to contract, and yet be declared void because it
affects the future operation of the contract by preventing "the like
substitution of its performance," in the language of Mr. Justice
Hughes.   If it is a legitimate exercise of the police power for public
safety in the one case, it should be so held in the other.

The theory on which agreements of the general character of that
here involved have been sustained, in the absence of legislation like
that contained in the act of 1909, is that the contract does not
itself purport to relieve the railroad company from the legal conse-
quences of its negligence, or that of its servants; and that the
release of the company arises only upon the acceptance of benefits,
which is optional with the employee after he has been injured.
For this reason it has been held that such contracts did not violate
statutes prohibiting contracts exempting a master from liability
to a servant arising from the negligence of the master or his other
servants.   Thus, in *Petty* v. *Brunswick Railway Company,* 109 *Ga.*
(supra), in the opinion of the court (p. 671), referring to the argu-
ment that the benefit agreement violated a statute of the character
mentioned, it was said: "As should be readily apparent, the weak-
ness of this position lies in the fact that it is based upon an entire

misconception of the meaning and effect of the contract thus assailed. It did not, as claimed, in any of its terms or conditions stipulate that the defendant company should be absolved from the legal consequences of its own negligence or that of its servants. On the contrary, it merely provided an additional remedy to that given by law to an employee who might suffer injury by reason of the negligence, actual or imputable, of his master. The latter remedy was left intact, undisturbed and unimpaired, and the injured employee might, or might not, at his option, take advantage thereof." In Ringle *v.* Penn. R., 164 Pa. 529 (30 Atl. 492, 44 Am. St. R. 628 and note), a case often cited on the subject, it was held that "In such a case it is not the signing of the release, but the acceptance of benefits after the accident, that constitutes the release." If this view is sound when urged for the purpose of sustaining benefit or relief agreements, it must be equally sound when urged against them, under a changed condition of the law. Thus, under these rulings, at the time the plaintiff in the present case was injured, there was no contract releasing the railroad company from damages arising from the result of its own negligence or that of its other servants, nor any fixed contract that the company should be so released; and if a contract releasing the company was made, it resulted from the acceptance of certain benefits, and became a definite contract of release only at that time, though springing from the former contract. In the meantime the legislature declared that no such contract of release should be valid, and that acceptance of benefits from a relief department of a railroad should not destroy a plaintiff's right of action, but that the amount of the payments or contributions of the company through such department could be set off in its favor, if it were liable in damages.

The plaintiff's right of action against the railroad company for the injury to his person arose after the passage of the act of 1909, and the liability of the railroad company is to be determined by that act. It gave him a right to recover for an injury arising from the negligence of a coemployee, although he might himself have been guilty of some negligence, and declared that he should not be debarred by the doctrine of assumption of risks of employment, as therein stated. This was different from what would have been the status had he been injured before its passage. It also contained the clause under discussion. Before any contract of release by ac-

cepting benefits from a fund arising from a common contribution had been made, the act of 1909 was adopted. We have endeavored to show that the act was a legitimate exercise of the police power of the State, for the preservation of the safety and welfare of a considerable class of the public. If the benefit agreement should be held to prevent such exercise of the police power of the State from being effective, the power of the State to preserve and protect the safety and welfare of its citizens could be much curtailed by contract. Under such a construction, although a police law might be on its passage, and about to take effect, prohibiting a certain thing from being done, parties might enter into an agreement, not making a present settlement, or a contract now fixing liability, but reserving the right to do such thing, or to elect to do it, after the passage of the act, and in spite of its provisions. This would subordinate the police power of the sovereign State to the operation of contracts, not the reverse, as the authorities declare. The second question of the Court of Appeals is answered in the negative.

3. The contention that the act of 1909 is violative of the fourteenth amendment to the constitution of the United States is practically covered by what has already been said. It is only necessary here to again cite the cases of Chicago etc. R. Co. 'v. McGuire, 219 U. S. (supra), Mobile etc. R. Co. v. Turnipseed, 219 U. S. 35 (31 Sup. Ct. 136, 55 L. ed.), and Louisville & Nashville R. Co. v. Melton, 218 U. S. 36 (30 Sup. Ct. 676, 54 L. ed. 921). The third question of the Court of Appeals is answered in the negative.

*All the Justices concur, except Beck, J., absent, and Atkinson, J., disqualified.*