## STATE OF GEORGIA *v.* WESTERN AND ATLANTIC RAILROAD COMPANY.

1. The terms of the act authorizing the lease of the Western & Atlantic Railroad (Acts 1889, p. 362) and of the lease made in pursuance thereof are sufficiently broad to provide for charges to be made for interstate shipments over that line, which lies partly in Georgia and partly in Tennessee, as well as for the regulation of intrastate traffic within the limits of Georgia.

2. The State of Georgia can not, as an exercise of its governmental power, prescribe rates of freight for interstate shipments by the Western & Atlantic Railroad Company. In view of the act of Congress to regulate interstate commerce, and its amendments, the legislature can neither do this directly nor through the State railroad commission.

3. An agreement by a company leasing the Western & Atlantic Railroad can not confer on the State railroad commission governmental power to regulate interstate freight rates which it does not possess as an agency of the State.

4. The State as the owner of the Western & Atlantic Railroad leased it for a term of years to a company. There was a provision in the act authorizing the lease, which was also incorporated by reference in the lease itself, to the effect that the company taking the lease should "be subject to and required to obey all just and reasonable rules, orders, schedules of freight and passenger tariffs as may be prescribed by the laws of this State and the Railroad Commission of this State, and said lease company shall charge no greater rate per ton per mile on through freight on said railroad than the local rate allowed and fixed on similar freights by the Railroad Commission for said railroad." *Held,* that, so far as concerns the making of interstate rates, this act and agreement are in conflict with the interstate-commerce act, as amended, which was enacted by Congress in pursuance of its constitutional power, and to that extent are inoperative.

5. So far as they deal with interstate freight rates, the terms of the lease act and of the lease can not be enforced either by injunction to prevent the use of a rate or classification filed and established in accordance with the act of Congress to regulate interstate commerce, as amended, or by decree for specific performance to compel the railroad company to charge no greater rates per ton per mile on through freight on that road than the local rate allowed and fixed on similar freights by the State railroad commission for said railroad, or to file new schedules and take proceedings before the interstate-commerce commission in respect to interstate rates, so as to make them conform to classifications and rates fixed by the State railroad commission.

NOVEMBER 15, 1912.

Equitable petition. Before Judge Pendleton. Fulton superior court. May 31, 1912.

By the act of 1889 (Acts 1889, p. 362), the Governor was authorized to lease the Western & Atlantic Railroad, which belongs to

the State, and extends from Atlanta, Georgia, to Chattanooga, Tennessee. The ninth section of the act provided, that "said lease company shall be subject to and required to observe and obey all just and reasonable rules, orders, schedules of freight and passenger tariffs as may be prescribed by the laws of this State and the Railroad Commission of this State; and said lease company shall charge no greater rate per ton per mile on through freight on said railroad than the local rate allowed and fixed on similar freights by the Railroad Commission for said railroad; and said company shall not discriminate against any railroad company or persons or parties or places having business connections or relations with said Western and Atlantic Railroad, but all schedules of freight and passenger tariffs shall be so arranged as to give all connecting roads and all places and persons having business relations with said road a fair and equal chance, doing equal justice between them in everything connected with the management of said road; and that said lease company shall have the exemptions, privileges, immunities, rights, and guarantees, and shall be subject to the same laws, liabilities, disabilities, and public burdens on other railroad companies in this State, and no more, in all cases where this act is silent and has made no provision on this subject." It was declared that the lessee, upon the execution of the contract of lease, should thereby become a body politic and corporate under the laws of this State, under the name of the Western and Atlantic Railroad Company. The Nashville, Chattanooga and St. Louis Railway became the lessee. In the contract of lease it was stipulated and agreed that the lease was made under and subject to all of the provisions of the act of the General Assembly, and that both parties thereto should be bound in every particular by the provisions of such act.

In November, 1911, the State filed its equitable petition, alleging, among other things, as follows: On October 15, 1902, the railroad commission of Georgia divided the railroads of this State into freight tariff classes, and under this classification the Western & Atlantic Railroad Company was put in class 1, now class A, which allowed and fixed for said road, and authorized it to charge, the rates of the Georgia Standard Tariff, without percentage. By doing this the railroad commission prescribed a schedule of freight tariffs for that railroad, and such tariffs were just and reasonable, and it became the duty of the company to observe and obey the

schedule of the freight tariffs so fixed. But the company has failed and refused to observe and charge the freight rates thus fixed, on interstate shipments of freight on and over that road, but charges on such shipments the rates fixed by the Southern Classification, which rates are different, higher and greater than the rates fixed by the Georgia Standard Tariff and the Georgia Classification. The company has for a long time been charging, on such shipments of freight, the rates fixed by the Southern Classification, and declares its purpose to continue to do so. It charges greater rates per ton per mile on through freight on said railroad than the local rates allowed and fixed on similar freights by the railroad commission of Georgia for such railroad. This results from the application of the Southern Classification to through freights. Illustrative instances are given of the difference in rates between Atlanta and Chattanooga. The Governor made a formal request and demand on the lessee to put into effect rates not higher than the Georgia Standard Tariff rates for all freight passing over said railroad, but this was declined. Thereupon the Governor directed the attorney-general and the special attorney of the State railroad commission to take the necessary legal procedure. Injunction was prayed to restrain the defendant from charging greater rates than those of the Georgia Standard Tariff and Classification for freight moving on and over that railroad, and to restrain the defendant from charging greater rates per ton per mile on through freight than the local rates on similar freight fixed and allowed by the railroad commission of this State for that railroad. It was also prayed that the defendant be compelled by the decree to specifically perform the provisions of the lease act and lease contract, "by applying said Georgia Standard Tariff and Classification to shipments of freight on and over said railroads, by charging to interstate shippers the just and reasonable freight tariffs fixed by the railroad commission of Georgia for said road, by charging no greater rates per ton per mile on through freight on said road than the local rates on similar freights fixed by the railroad commission for said road, and by filing with the interstate-commerce commission a tariff of freight rates in compliance with the provisions of said lease act and said lease contract." There was also a prayer for general relief.

The court sustained a general demurrer to the petition and dismissed it. Whereupon the plaintiff excepted.

*T. S. Felder, attorney-general,* and *James K. Hines,* for plaintiff.
*Tye, Peeples & Jordan* and *Claude Waller,* for defendant.

LUMPKIN, J. The State sought to obtain an injunction and a decree for specific performance against the Western & Atlantic Railroad Company, the lessee of the railroad belonging to the State. The petition was dismissed on demurrer. There was no controversy as to intrastate shipments. The whole difference arose in regard to interstate shipments. As to such freights the defendant company is alleged to be employing the Southern Classification, the rates of which are higher than the rates fixed by the State railroad commission in the Georgia Classification. The demurrer contains numerous grounds, but they may be grouped about three leading questions: (1) Under the proper construction of the lease act and contract, do the provisions in regard to the tariffs and classifications of the State railroad commission apply to interstate freight as well as to intrastate freight? (2) If so, are such provisions, so far as they affect interstate freight, valid, or are they in conflict with the acts of Congress enacted under authority of the interstate-commerce clause of the constitution of the United States? (3) Under the facts of the case, and in view of the lease act and contract, and of the Federal law, can a decree be framed and entered for injunction and specific performance as prayed in the petition?

1. The lease of the Western & Atlantic Railroad, which belongs to the State, was authorized by the act of November 12, 1889 (Acts 1889, p. 362). By its terms the lessee became a body politic and corporate under the laws of this State, under the name of the Western & Atlantic Railroad Company. By the ninth section of the act it was declared that the lease company "shall be subject to, and required to observe and obey all just and reasonable rules, orders, schedules of freight and passenger tariffs as may be prescribed by the laws of this State and the Railroad Commission of this State; and said lease company shall charge no greater rate per ton per mile on through freight on said railroad than the local rate allowed and fixed on similar freights by the Railroad Commission for said railroad." It was contended on behalf of the defendant that this provision in the act of the legislature, which was also incorporated by reference in the lease, applied only to intrastate freight rates. Possibly there might be ground for contending

that as laws do not generally apply to the State unless so expressed or evidently intended, and as the State was the owner of the railroad, the declaration that the lease company should be subject to the rules and regulations of the State railroad commission was inserted to avoid any possible claim that the lessee was clothed with the exemption of the State. But the act did not stop there. It further declared that the leasing company should charge no greater rate per ton per mile on "through freight" on said railroad than the local rate allowed and fixed on similar freights by the railroad commission for such railroad. In connection with the discussion of joint rates, "through freight," as that expression is ordinarily employed, has been said to be that which comes to a railroad from some other railroad, or which starts at some point on one line, but in order to reach its destination is delivered to a connecting carrier. *Hill* v. *Wadley Southern Ry. Co.*, 128 *Ga.* 705 (57 S. E. 795) ; 38 Cyc. 302. It was argued by counsel for the State that this definition was not exhaustive, and that "through freight" might include freight carried from one terminus to another terminus of a railroad. Without dealing with the meaning of "through freight" generally, as intrastate freight rates are entirely within the jurisdiction of the State railroad commission, whether the freight passes over one railroad or two, the act and agreement as to charging no greater rate per ton per mile on through freight than the local rate allowed by the commission would have been entirely useless and mere surplusage if applied to intrastate shipments alone. Apparently, from the terms of the act, it was intended to cover something beyond what was already the law as to the fixing of intrastate rates by the commission. The expression "through freight on said railroad" was broad enough to cover at least through freight passing over the entire railroad. We think it is manifest that, in addition to the regulation of intrastate freight rates, the terms of this act and lease contract also extended to interstate rates on that railroad. The State so contends, and the relief sought is on that basis.

2. Is that part of the lease act and contract relative to the regulation of schedules and tariffs for interstate shipments by the State railroad commission, and the charging of no more per ton per mile for such freights than should be allowed by the railroad commission as to local freights on that railroad, valid and enforce-

able, in view of the interstate-commerce clause of the constitution of the United States and the acts of Congress passed in pursuance thereof? If the rates declared by the railroad commission of the State are binding upon the defendant company as to interstate freights, it must be for one of two reasons: either that such regulations are binding as being valid governmental acts, exercised through the railroad commission; or because, not being binding as such, they became binding by being incorporated by reference in the lease contract, and remain of force as a provision of such contract.

Neither the legislature of this State nor the railroad commission created by it can make laws or rules fixing freight rates in Tennessee, any more than the legislature of Tennessee can fix freight rates in Georgia. Nor have they the power to fix freight rates for interstate shipments; certainly not where the subject has been specifically dealt with by Congress, under its constitutional powers. As to the subject of commerce, the decisions of the Supreme Court of the United States are divisible into three classes: (1) Those in which certain powers of the States were held to be exclusive; (2) those in which it was held that the States might act in certain matters in the absence of legislation by· Congress; and (3) those in which it was held that in certain respects the power of Congress was exclusive and the States could not interfere at all. Covington etc. Bridge Co. *v.* Kentucky, 154 U. S. 204, 209 (14 Sup. Ct. 1087, 38 L. ed. 962).

In 1876 the Supreme Court of the United States decided a series of cases touching the power of regulation by a State. In one of them it was held that a statute of Wisconsin enacted in 1874, to provide for a maximum charge to be made by railroad companies in that State, was confined to state commerce or such interstate commerce as directly ́affected the ·people of the State; and that, until Congress acted in relation to the matter, the law was valid, though it indirectly affected those beyond the State. Peik *v.* Chicago etc. Ry. Co., 94 U. S. 164, 178 (24 L. ed. 97) ; Munn *v.* Illinois, 94 U. S. 113 (24 L. ed. 77) ; Chicago etc. R. Co. *v.* Iowa, 94 U. S. 155 (24 L. ed. 94). At that time Congress had not established the interstate railroad commission or enacted laws for the regulation of rates for the transportation of interstate freights. In 1886 was decided the case of Wabash etc. Ry. Co. *v.* Illinois, 118 U. S. 557 (7 Sup. Ct. 4, 30 L. ed. 244). In the decision the

cases above cited were considered, and the meaning of and limitation upon what was there said was discussed. In the opinion Mr. Justice Miller said (p. 575): "We must therefore hold that it is not, and never has been, the deliberate opinion of a majority. of this court that a statute of a State which attempts to regulate the fares and charges by railroad companies within its limits, for a transportation which constitutes a part of commerce among the States, is a valid law." The Chief Justice and two Associate Justices dissented. Without discussing the views· of the majority of the court or those of the dissenting Justices in the Wabash case, as the law then stood, there can be no doubt whatever that when Congress enacted laws dealing specifically with the matter of establishing and changing interstate rates, the State could not enact statutes dealing with the same subject and undertaking to regulate such rates; nor could it accomplish the same result through rules of the State railroad commission. And previous legislative action on the subject would yield to conflicting action by Congress, within its constitutional power. In Southern Ry. Co. v. Reid, 222 U. S. 424 (32 Sup. Ct. 140, 56 L. ed. 257), decided in 1911, the following appears in the syllabus, and is supported by the opinion: "By the specific provisions of the act to regulate commerce, as amended, Congress has taken control of rate making and charging for interstate shipments, and in that respect such provisions super-sede State statutes on the same subject." See also Gulf, Colorado, etc. Ry. v. Hefley, 158 U. S. 98 (15 Sup. Ct. 802, 39 L. ed. 910); Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426 (27 Sup. Ct. 350, 51 L. ed. 553); Hall v. DeCuir, 95 U. S. 485 (24 L. ed. 547).

Counsel for the State cited and relied on Railroad Co. v. Maryland, 88 U. S. (21 Wallace) 456 (22 L. ed. 678). There a statute of Maryland granted to the Baltimore and Ohio Railroad Company the right to build a branch road from Baltimore to Washington City. It provided that the company should pay to the treasurer for the use of the State one fifth of the whole amount which might be received for the transportation of passengers on such road. Another clause stated that the company might charge, for conveying each passenger the whole distance from Baltimore to Washington, the sum of $2.50. For a time the company charged $1.50 each for such passengers, and paid one fifth thereof to the State.

It then refused to pay further, and the State sued for the amount claimed to be due. A recovery was had and affirmed. The real question was as to the validity of the agreement to pay one fifth of the receipts from transportation of passengers. The Supreme Court of the United States held that such agreement was not in violation of the constitution of the United States. The matter of the charge for passage from Baltimore to Washington was not the real question; and while some of the language was broad, it did not amount to an express ruling on that point. Besides, that decision was rendered in 1874, before Congress had enacted the interstate-commerce law. It was considered in Northern Securities Co. v. United States, 193 U. S. 197 (24 Sup. Ct. 436, 48 L. ed. 679). On page 347, Mr. Justice Harlan, delivering the opinion of the majority of the court, said: "The court there recognized the principle that a State has plenary powers 'over its own territory, its highways, its franchises, and its corporations,' and observed that 'we are bound to sustain the constitutional powers and pre-rogatives of the States, as well as those of the United States, whenever they are brought before us for adjudication, no matter what may be the consequences.' Of course every State has, in a general sense, plenary power over its corporations. But is it conceivable that a State, when exerting power over a cor-poration of its creation, may prevent or embarrass the exercise by Congress of any power with which it is invested by the con-stitution? In the case just referred to the court does not say, and it is not to be supposed that it will ever say, that any power exists in a State to prevent the enforcement of a lawful enactment of Congress, or to invest any of its corporations, in whatever busi-ness engaged, with authority to disregard such enactment or defeat its legitimate operation. On the contrary, the court has steadily held to the doctrine, vital to the United States as well as to the States, that a State enactment, even if passed in the exercise of its acknowledged powers, must yield, in case of conflict, to the suprem-acy of the constitution of the United States and the acts of Con-gress enacted in pursuance of its provisions." And see references to the same case (p. 378) by Mr. Justice White in the dissenting opinion.

An examination of the act of Congress to regulate interstate commerce, as amended, will show that it deals with the method of

establishing interstate rates, requires publication of them, provides the method of changing them, and prohibits any carrier from charging, demanding, or receiving a greater or less compensation than, or one different from, those specified in the tariff in effect at the time. It makes provision for complaints, or for the commission to act on its own initiative; for a hearing, and the determination of what shall be just and reasonable rates or charges to be thereafter observed as maximum charges, and what regulation or practice in respect to such transportation is just, fair, and reasonable to be thereafter followed; and for the suspension of the operation of any schedule, in order to allow time for hearing and consideration. A violation of the act is made penal. Drinker on Interstate Commerce Act (Supplement), 1. It will thus be seen, both from the legislation itself and from its construction by the Supreme Court of the United States, that the act of Congress of 1887, as amended, covers the subject of establishing, changing, and regulating charges for interstate freights. This being so, under the repeated rulings of that high court, the State has no power to regulate such interstate rates either through the legislature or through the State railroad commission, and previous legislation by the State must yield to that on the same precise subject by Congress.

3. Sovereignty is an attribute inherent in a State government. If a State as sovereign has not the power to regulate rates of freight in interstate commerce, a corporation created by it and leasing its property can not confer upon it any such sovereign power by contract. This would be to make the creature greater than the creator. As we have held that this State has no power to regulate interstate freight rates by law, the Western & Atlantic Railroad Company could not by contract confer upon the State governmental authority to make valid laws on the subject. Hence, considered as laws or rules regulating interstate freights, rates and classifications made by the State railroad commission have no force either by virtue of the act of the legislature or by virtue of any agreement on the part of the lessee company.

4. It is contended, however, that, while the classification of the State railroad commission may not be binding as an exercise of governmental authority, a classification made by it is binding on the defendant company under a contract between the State, as the

owner of the railroad, and the lessee of it. It is argued, that the State owned the railroad, and as such owner could have operated it and have filed with the interstate-commerce commission schedules of interstate rates in accordance with the act of Congress; that it had the right to lease the railroad to the defendant company, and, as one of the terms of the lease, to reserve the privilege of fixing such rates and classifications for freights moving in interstate commerce over the railroad.

In *Western & Atlantic Railroad* v. *Carlton*, 28 *Ga.* 180, 182, it was declared: "When a State embarks in an enterprise which is usually carried on by individual persons or companies, it voluntarily waives its sovereign character, and is subject to like regulations with persons engaged in the same calling." The manner of enforcement against the State, or the question of remedy, is another matter. Having dealt with the question of the effect of the classification of the State railroad commission from the standpoint of the exercise of the governmental authority of the State, we now consider the effect of the contract as one between an owner of a railroad and one to whom he leases it, without reference to the fact that one of the contracting parties is the State as differentiated from an individual or corporation.

In the petition filed by the State it is alleged that the defendant is charging rates in accordance with the Southern Classification. There is no allegation that such rates have not been duly filed and put in force as provided by the act of Congress, and, on the familiar principle that pleadings are to be taken most strongly against the pleader, it must be assumed that this classification has been thus put in force. Indeed the proceeding is not to prevent a rate or classification from being put in force, but to stop by injunction the use of one already in force.

In Texas and Pacific Railway Co. *v.* Abilene Cotton Oil Co., supra, suit was brought against a railroad company on the ground that the charges made by it on certain interstate shipments were unjust and unreasonable. It was declared that "The interstate-commerce act was intended to afford an effective and comprehensive means for redressing wrongs resulting from unjust discriminations and undue preference, and to that end placed upon carriers the duty of publishing schedules of reasonable and uniform rates; and, consistently with the provisions of that law, a shipper can not

maintain an action at common law in a State court for excessive and unreasonable freight rates exacted on interstate shipments, where the rates charged were those which had been duly fixed by the carrier according to the act, and had not been found to be unreasonable by the interstate-commerce commission."

In Armour Packing Co. v. United States, 209 U. S. 56 (28 Sup. Ct. 428, 52 L. ed. 681), while a certain interstate rate was in force, a contract was made for future shipments during about six and a half months, in accordance with such published rate. Later, during the time covered by the contract, the rate was changed in the manner provided by the act of Congress. Nevertheless transportation was obtained in accordance with the rate in force when the agreement was made. It was held that this was illegal. In the opinion Mr. Justice Day said (p. 81) : "There is no provision excepting special contracts from the operation of the law. One rate is to be charged, and that the one fixed and published in the manner pointed out in the statute, and subject to change in the only way open by the statute. There is no provision for the filing of contracts with shippers, and no method of making them public defined in the statute. If the rates are subject to secret alteration by special agreement, then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart."

In Louisville and Nashville R. Co. v. Mottley, 219 U. S. 467 (31 Sup. Ct. 265, 55 L. ed. 297), it appeared, that, as a result of a collision of trains belonging to the Louisville & Nashville Railroad Company, Mottley and his wife received serious personal injuries. They claimed that the collision was caused by the negligence of the agents and servants of the railroad company. A settlement was effected, by which the injured parties released all claim for damages, and in consideration thereof the railroad company agreed to issue free passes on its railroad and branches (which were interstate lines) to such parties for the remainder of the current year, and thereafter to renew such passes annually during the lives of such parties or either of them. The company complied with the agreement for many years, but, after the passage of the act of Congress of 1906, amending the act regulating commerce, refused to further perform it, on the ground that such act made the further performance illegal. Mottley and his wife brought suit to

enforce the agreement. The State court granted the relief prayed, and the case was carried to the Supreme Court of the United States, where the judgment was reversed. In the opinion Mr. Justice Harlan said (p. 482) : "Congress might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable or to impair its value. That the exercise of such power may be hampered or restricted to any extent by contracts previously made between individuals or corporations, is inconceivable. The framers of the constitution never intended any such state of things to exist." And again (pp. 484, 485) : "In Pomeroy on Contracts, § 280 (Specific Performance), after observing that an illegal contract can not be made the basis of any judicial proceeding, and that no action in law or equity could be maintained upon it, said: 'This impossibility of enforcement exists, whether the agreement is illegal in its inception, or whether, being valid when made, the illegality has been created by a subsequent statute.' Among the cases cited by the author in support of that view was Atkinson *v*. Ritchie, 10 East, 530, 534, in which the Chief Justice, Lord Ellenborough, delivering the opinion of the court, said: 'That no contract can properly be carried into effect, which was originally made contrary to the provisions of law, or which, being made consistently with the rules of law at the time, has become illegal in virtue of some subsequent law, are propositions which admit of no doubt.' In Kentucky & Indiana Bridge Company *v*. Louisville & Nashville Railroad Co., 34 Am. & Eng. R. Cases, 630 [2 I. C. C. R. 162, 189], Judge Cooley said: 'But the act to regulate commerce is a general law, and contracts are always liable to be more or less affected by general laws, even when in no way referred to. . . But this incidental effect of the general law is not understood to make it a law impairing the obligation of contracts. It is a necessary effect of any considerable change in the public laws. If the legislature had no power to alter its police laws when contracts would be affected, then the most important and valuable reforms might be precluded by the simple device of entering into contracts for the purpose. No doctrine to that effect would be even plausible, much less sound and tenable.' 'If one agrees,' said Mr. Parsons, 'to do a thing which it is lawful for him to do, and it becomes unlawful by an act of the legislature, the act avoids the promise.' Parsons on Contracts

(6th ed.), 675." We have quoted at some length from this de-cision, because it deals directly with the effect of the act of Congress regulating interstate commerce upon the carrying out of an antecedent contract. In the same decision numerous other cases were cited; but the decisions of the Supreme Court of the United States are controlling on Federal questions, and it is unnecessary to support them with additional citations. See, in this connection, *Savannah, Florida & Western Ry. Co.* v. *Bundick,* 94 *Ga.* 775 (21 S. E. 995); *Washington* v. *Atlantic Coast Line R. Co.,* 136 *Ga.* 638, 644 (71 S. E. 1066, 38 L. R. A. (N. S.) 867).

From what has been said it will be seen that individuals or corporations can not by executory contracts, whether made before or after the passage of the act of Congress, prevent or change its operation. It may sometimes work a hardship upon a shipper who has agreed with a carrier to transport his interstate shipments for a given length of time at the rate then established, if the interstate-commerce commission permits a change to be made at the will of the carrier. But it has been declared by the Supreme Court of the United States that he must make his contract with reference to the general law and subject thereto, and that the hardship is a matter which appeals to the legislative department of the government or to the commission, but furnishes no ground for interference by the courts with the operation of the law. If the contract of a shipper with a carrier must yield to the act of Congress in regard to interstate commerce, it can not be successfully claimed that the contract between a lessor and a lessee is any more sacred. Any other ruling would result in utter confusion, and would practically nullify the interstate-commerce law at the will of contracting parties. If the State, in its capacity as the owner of this railroad, can by contract reserve to itself or its agents the right to determine rates for interstate shipments, it would seem that in granting charters to new railroads, or in granting additional franchises to railroads now existing, or by any agreement based upon a consideration, the State could reserve to itself the right to fix interstate rates on railroads engaged in interstate commerce; and if other States should do the same thing, the uniformity and general system contemplated by the act of Congress would be practically destroyed. If Georgia could regulate rates as to freight transported wholly or partly in Tennessee by this road, why

might not the latter State, by contract—say by acquiring and leasing some railroad or terminal facility to the same company,— claim the right to regulate rates for freights coming into Georgia? Moreover, might not owners of railroads crossing the State line, who were also shippers over them (as in lumber and transportation industries), lease the roads to some company, reserve the right to fix interstate rates, and thus in effect fix their own rates on their interstate shipments?

Section 1 of the interstate-commerce act, as amended, declares that it extends to "any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, . . from one State or territory of the United States . . to any other State or territory of the United States," etc. It is thus the corporation or person "engaged in the transportation," not the lessor, who is contemplated by the provisions of the act. Paragraph 4 of the same section reads as follows: "And it is hereby made the duty of all common carriers subject to the provisions of this act to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affectting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this act, which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this act upon just and reasonable terms, and every such unjust and unreasonable classification, regulation, and practice with reference to commerce between the States and with foreign countries is prohibited and declared to be unlawful." It will be seen that this paragraph imposes certain duties on "all common carriers subject to the provisions of this act." Among them is "to establish, observe, and enforce just and reasonable classifications of property for transportation, . . and just and reasonable regulations and practices affecting classifications, rates,

or tariffs;" and every unreasonable classification, regulation, and practice in reference to interstate commerce is prohibited and declared to be unlawful. Where the duty is imposed by the act of Congress upon the carrier actually engaged in operating the railroad to establish just and reasonable classifications as to interstate freight, and to do various other specified things justly and reasonably, and the failure to do so is declared unlawful, if charged with a violation of the act would it be any answer on the part of the carrier to say that it did not consider that it had established reasonable rates, but the lessor thought so, and it had agreed to abdicate its judgment in favor of that of its lessor? If the lessor could reserve the right to determine absolutely, so far as the lessee is concerned, what are just and reasonable interstate rates, there would seem to be no reason why the lessor by contract could not also reserve the right to determine any or all of the other matters included in that paragraph, covering substantially the whole field of operation as to interstate freight. It can not be that the lessor could do this and successfully claim that it would be a compliance with the duties imposed by law directly upon the lessee for the latter to do whatever the lessor might direct it to do, subject only to change by the interstate-commerce commission.

As indicated by Mr. Justice Harlan, in the Northern Securities case, supra, it is inconceivable that Congress imposed these various duties on common carriers as to interstate shipments, and provided for holding them responsible for the discharge of such duties, but made it permissible for the carrier to bind itself by contract to abide the determination of its lessor in regard to them. Suppose that a railroad company engaged in interstate transportation should file with the interstate commission a schedule accompanied by a statement that in the opinion of the carrier it was a grossly unjust and unreasonable one, but that it had agreed with its lessor to file it as being just and reasonable, because the latter thought so, would it be supposed for a moment that this was a proper compliance with the act of Congress? If not, then must the carrier suppress its true opinion, and advance the opinion of another, whether it believes it to be reasonable and just or not, in dealing with the interstate-commerce commission? By section 3 of the act it is declared to be unlawful for any common carrier subject to its provisions to give any undue or unreasonable preference or

54

advantage to any particular "person, company, firm, corporation, or locality." Suppose that the carrier bona fide believed that a schedule or rate declared by the State commission, and which it was called upon to put in force to control interstate rates, gave an undue or unreasonable preference or advantage to a particular locality, must it nevertheless offer such a schedule to the interstate-commerce commission as being just and reasonable, because it agreed that its lessor should have the power to fix just and reason-able rates?

By section 10 it is declared that any common carrier subject to the provisions of the act,. or, if such common carrier is a corpora-tion, any director or officer thereof, or "any receiver, trustee, *lessee* [italics ours], agent, or person acting for or employed by such corporation," who, alone or with any other corporation, com-pany, person, or party, shall wilfully do or cause to be done any-thing declared unlawful by the act, or aid or abet it, or wilfully omit to do anything required to be done, or willingly permit, aid, or abet such an omission, shall be guilty of misdemeanor. If, to a proceeding under this section, the company or its agents should plead that they filed a schedule which they did not believe to be reasonable and just, because its lessor directed it to do so by virtue of the lease, what answer would this be to the drastic provisions of that section? The act also contemplates the establishment of joint rates. Has the railroad commission of Georgia authority, under the contract, to regulate all of the joint rates which may be made by the Western & Atlantic Railroad Company with other companies throughout the country?

It is no answer to these queries to say that the petition in the present case alleges that the classification and rates which have been established by the State commission should be, and in the particular instance are in fact, reasonable and just. The act of Congress provides a system for establishing and altering interstate rates and regulations which shall be reasonable and just. As to such rates it puts the interstate carrier directly under the juris-diction of the interstate-commerce commission. It affords others who may so desire an opportunity to complain to that commission. But it leaves no opening for a lessor of a railroad to intervene be-tween the carrier and the commission, and to fix interstate rates and classifications which the carrier shall be bound to put in force.

or seek to put in force, as reasonable and just. Congress has provided a comprehensive system in regard to interstate rates, as declared by decisions cited above. The contract sought to be enforced provides a system for the determination of interstate rates for this company through the judgment of a State commission which has no authority to deal with interstate rates. The two can not be reconciled. When Congress has acted so as to directly cover the subject of establishing and changing interstate rates, the State law, any rule of the State commission, and the agreement that it shall be binding as to interstate freights, must yield.

The argument that the State, if it were operating the railroad, might establish rates, file with the interstate-commerce commission schedules, and do the other things provided by the act of Congress, and therefore it can reserve the right to determine these things for its lessee, is ingenious, but, in our opinion, unsound as applied to interstate rates. The interstate-commerce law deals with carriers. The State is not operating the railroad, and is not a carrier. What it might do if it were a carrier is no test of what it may do when it is not a carrier, but a lessor. The lessee is the carrier, and as to interstate rates it is controlled by the act of Congress, not by a contract with or regulation of its lessor, where the two are not in harmony.

5. It is alleged that the defendant has long been using the Southern Classification, and it is not denied that this was filed and established as required by the act of Congress. The prayer for injunction seeks to restrain the defendant from charging greater rates than those of the Georgia Standard Tariff, or greater rates per ton per mile on through freight than the local rates on similar freights fixed and allowed by the State railroad commission for that road. In Louisville & Nashville R. Co. v. Mottley, supra, it was said: "It is now the established rule that a carrier can not depart to any extent from its published schedule of rates for interstate transportation on file, without incurring the penalties of the statute." It is plain that the prayer for injunction can not be granted. So as to the prayer for specific performance. The two prayers are complements of each other. The additional clause in the latter prayer that the defendant also be required to specifically perform by filing with the interstate-commerce commission a schedule in accordance with the lease act and contract might perhaps be

met by saying there was no agreement as to such publishing or filing. But conceding that there was, what has been said above controls the whole case. The ruling made also renders it unnecessary to discuss the point urged by the defendant as to whether, if specific performance could otherwise be granted, a court of equitable jurisdiction would undertake by one decree to require a continuous series of filings of schedules, as the State classification might be changed from time to time.

It follows that there was no error in dismissing the petition on demurrer.

*Judgment affirmed. All the Justices concur, except Hill, J., disqualified.*