## RAILROAD COMMISSION OF GEORGIA *et al. v.* LOUISVILLE AND NASHVILLE RAILROAD COMPANY.

1. Under the provisions of the Code of this State, the railroad commission had statutory authority to pass an order providing that "all railroads selling mileage or penny scrip books are hereby required, on and after February 1, 1913, to pull the same on the trains of the company selling the same, when presented by the holders for transportation between points wholly within the State of Georgia, except where passengers board trains in cities of 10,000 population or more according to the United States census of 1910, in which places mileage or penny scrip shall be exchanged for tickets."

2. The statute and the order of the railroad commission passed thereunder are not in violation of the fourteenth amendment of the constitution of the United States, as being an unlawful interference with the liberty of contract, or a taking of property without due process of law.

(*a*) They do not violate the due-process clause of the State constitution.

(*b*) That a State, through its legislature or its railroad commission, can not fix a reasonable maximum rate for the carriage of passengers by railroads, and then compel them to issue certain tickets to certain persons at a less rate, does not negative the power to regulate carriers of passengers who voluntarily adopt such practice. As to mileage and penny scrip books issued or to be issued since the date of the order, this is clear.

3. In regard to such mileage and penny scrip books as were issued before the passage of the rule or order of the railroad commission, they were issued subject to the statutory power of the railroad commission to make regulations in regard to such railroads as carriers of passengers; and such regulatory order as to operation was not violative of the provision of the constitution of the United States which declares that no State shall pass any law impairing the obligation of contracts.

4. The fact that railroads, like common carriers at common law, could make reasonable rules and regulations in regard to their own operation, in the absence of any statute or valid rule of a railroad commission, does not negative the power of the State, directly by legislative act, or through a railroad commission duly authorized, to regulate such carriers.

5. Where under statutory authority the railroad commission of a State, after full hearing as to the facts, passes a regulatory order of the character of that stated in the first headnote, it will not be declared void by the courts merely because, in the absence thereof, a different regulation or agreement made by the railroad companies might have been held valid.

6. Where such a regulatory order has been made by the State railroad commission, within its statutory authority, after a full hearing from the parties concerned, including the carriers, the courts will not regard as of no effect the determination of the commission as to the reasonableness and propriety of such order, or deal with those questions as if the body charged with the duty of considering them had not acted upon them.

(*a*) The public power to regulate railroads and the private right of ownership of such property coexist, and the one does not destroy the other. Where the power to regulate is so arbitrarily exercised as to infringe

52

the rights of ownership, the exertion is void as being repugnant to the fourteenth amendment of the constitution of the United States, and to the due-process clause of the State constitution.

7. The evidence in this case was conflicting, but it did not show that the railroad commission acted so unreasonably or arbitrarily as to authorize an injunction to be granted.

8. Where an order is promulgated by the railroad commission, although a minority of the members thereof may dissent, the order passed by the majority stands as the official action of the body, and is to be dealt with as such.

9. The order above mentioned is not invalid on the ground that it directly affects and trammels interstate commerce.

10. Nor is it invalid on the ground that it is discriminatory.

BECK, J., dissenting. The order of the railroad commission under attack in this case is invalid and void: (1) because it is an unauthorized interference with the reasonable regulation of the railroad selling the mileage and penny scrip books, in regard to the manner of using such books; (2) because it violates the due-process clause of the State and Federal constitutions, in that it violates the constitutional guaranty of freedom in the exercise of the right to make contracts.

NOVEMBER 18, 1913.

Injunction. Before Judge Ellis. Fulton superior court. February 7, 1913.

On November 8, 1912, the Railroad Commission of Georgia passed the following order: "Resolved, by the Commission, that all railroads selling mileage or penny scrip books are hereby required, on and after February 1, 1913, to pull the same on the trains of the company selling the same, when presented by the holders for transportation between points wholly within the State of Georgia, except where passengers board trains in cities of 10,000 population or more according to the United States census of 1910, in which places mileage or penny scrip shall be exchanged for tickets." The Louisville & Nashville Railroad Company filed its petition to enjoin the order on the following grounds, among others: The issuance and sale of mileage scrip books below the maximum rates of passenger fare could not be compelled by the legislature or by the railroad commission under the powers delegated to it, but the issuance and sale of the same was voluntary; petitioner and other interested carriers have the right to attach to them the condition requiring the exchange of coupons for tickets, as an incident to the checking of baggage and travel thereon, and have the right to make with the purchasers of said books contracts embodying such conditions; the railroad commission of Georgia has no jurisdiction and authority over the subject which

would justify it in passing said order; and in passing said order the commission exceeded its powers and functions. The order invades the right of petitioner to attach any condition which it sees fit to a privilege which it voluntarily gives, and which it could not be compelled to give; and unwarrantably interferes with its right to make a contract with the purchaser of such books, embodying the conditions upon which the same shall be used. Said order is an unlawful invasion and denial by the railroad commission of the property right of petitioner of proper and reasonable management and conduct of its affairs, in that it deprives petitioner of the opportunity of protecting its revenue by proper and reasonable checks, and of the reasonable opportunity to safeguard the proper checking of baggage. Petitioner avers that the right of such reasonable management is a property right which can not be denied it by the State or the commission; and that said order is in conflict with the due-process clause of the State constitution. Said order deprives petitioner of the right of making a legal contract with the purchasers of said books, which right of contract is a property right, and in this respect violates said provision of the State constitution. Said order deprives petitioner of the right to make a contract with other carriers as to the terms and conditions under which interchangeable mileage or penny scrip shall be issued and used, and therefore violates said provision of the State constitution. The order of the railroad commission is violative of the clause of the constitution of the United States which prohibits a State from passing any law impairing the obligation of contracts. Said order operates as a regulation of interstate commerce, and will result in unduly and illegally burdening and interfering with the same. Said order is unreasonable. And it is discriminatory as excepting cities of ten thousand or more population.

The defendants demurred to the petition on various grounds, which were urged as reasons why the injunction should not be granted. After hearing evidence and argument, the trial judge granted the injunction as prayed, and the defendants excepted.

*James K. Hines, Walter McElreath,* and *Mayson & Johnson,* for plaintiffs in error.

*Tye, Peeples & Jordan* and *McDaniel & Black,* contra.

FISH, C. J. The controlling questions involved may be considered under three general heads: (1) Did the State railroad commission

have statutory power to make the regulation under consideration? (2) If so, does such statute conflict with the fourteenth amendment of the Federal constitution, or the clause of the State constitution forbidding the depriving of any person of life, liberty, or property without due process of law? (3) If the commission has power to make regulations of this character, has it exercised the power so arbitrarily and unreasonably in the particular case before us as to authorize the courts to declare such action illegal?

Did the State railroad commission have statutory authority to make a regulation of this character? By section 2638 of the Code of 1910, it is declared that "All contracts and agreements between railroad companies doing business in this State, as to rates of freight and passenger tariffs, shall be submitted to said commissioners for inspection and correction, that it may be seen whether or not they are a violation of the law or of the provisions of the constitution, or of this article, or of the rules and regulations of said commissioners; . . and said commissioners may make such rules and regulations as to such contracts and agreements as may be then deemed necessary and proper." The plaintiff alleges that it issues interchangeable mileage books by agreement with other railroads. In section 2663, among other things, it is declared that the commission is authorized "to require all common carriers and other public-service companies under their supervision to establish and maintain such public service and facilities as may be reasonable and just." Large powers of regulation as to freight and passenger carriage are also declared to exist in the commission, by section 2630. In *Wadley Southern Ry. Co.* v. *State,* 137 *Ga.* 497 (73 S. E. 741), Mr. Justice Evans, delivering the opinion, said (p. 505): "The power of the legislature to create a commission to regulate public-service corporations, and to prevent unjust discriminations by them is too well established in the jurisprudence of this State to be contested at this late day." Again he said (p. 509): "It is contended that section 2657 [which prohibits discrimination against any connecting line and requires the furnishing of the usual and customary facilities for the interchange of freights to the patrons of all lines] does not require the affording of facilities of the character required by this order of the commission, but that its requirement is only applicable to physical connections and physical appliances. We do not think the section should be so restricted in its

application. It applies to every facility necessary for the safety and convenience of passengers and for the prompt transportation of freight. Besides, the more recent act of 1907 (Civil Code, § 2630) confers on the railroad commission the power to require all railroads to maintain such public service and facilities as may be reasonable and just. . . At common law common carriers were allowed to discriminate in favor of some of their patrons, so long as the bestowal of favors did not violate their duty to the public. *Ocean Steamship Co.* v. *Savannah Supply Co.*, 131 *Ga.* 834 (63 S. E. 577, 20 L. R. A. (N. S.) 867, 127 Am. St. R. 265, 15 Ann. Cas. 1044). But railroad companies of the present day are not only common carriers charged with the performance of their common-law duties as such, but they are also quasi public institutions, and in this relation owe additional duties to the public and are subject to governmental regulation."

In *Perry* v. *Atlantic Coast Line Railroad Co.*, 9 *Ga. App.* 260 (70 S. E. 1122), the case arose before the railroad commission passed the order now attacked. A person with a mileage book presented it to a conductor, who declined to accept the coupons in payment of fare. The passenger refused to pay his fare otherwise, and was ejected. Whereupon he brought an action for damages. The Court of Appeals held: "There is no law or regulation of the railroad commission in this State which prevents a common carrier from making with members of the general public a contract by which the carrier sells to a member of the public at a reduced rate a mileage book, which shall not be good for passage on trains except from non-agency stations, or from agency stations not kept open for the sale of tickets, unless it is first exchanged for a ticket." In the opinion Powell, J., said (p. 264): "With the inconvenience which results from passengers being required to exchange mileage coupons for tickets, we, as judges, have no right to concern ourselves. That is a matter which addresses itself initially to the transportation companies, and finally to the legislature or to the railroad commission. So long as the law and the railroad commissioners' rules remain as they are, it is our duty to enforce these contracts as they are made; and decisions from other States, where they have different laws or different regulations adopted by the railroad commission, are neither persuasive nor controlling." This clearly recognized the fact that the railroad commission had legisla-

tive authority to make a regulation on the subject; and while it is not binding authority upon this court, it is persuasive, and, we think, correct.

In State *v.* Atlantic Coast Line R. Co., 61 Fla. 799 (54 So. 900), it was declared: "The difficulty of making a specific enumeration of all such powers as the legislature may intend to confer upon railroad commissioners for the regulation of common carriers in the interest of the public welfare renders it necessary to confer some power in general terms; and general powers given are intended to confer other powers than those specifically enumerated." In the case before us the legislature conferred upon the railroad commission authority to make rules and regulations in regard to such carriers. The order of the railroad commission under consideration provides that all railroads selling mileage or penny scrip books shall "pull the same on the trains of the company selling the same, when presented by the holders for transportation between points wholly within the State of Georgia, except where passengers board trains in cities of 10,000 population or more according to the United States census of 1910, in which places mileage or penny scrip shall be exchanged for tickets." This was a regulation, and clearly fell within the power of regulation conferred by the statute on the commission.

The next question is whether the statute, in so far as it confers such power, and the order in pursuance thereof, are unconstitutional. Is this order in violation of the fourteenth amendment of the constitution of the United States, in that it interferes with freedom of contract, which is a part of "the liberty" guaranteed thereby? In support of this theory several cases are cited, but they are not sufficient to establish the contention. It is settled by the decision in Lake Shore & Michigan Southern Ry. Co. *v.* Smith, 173 U. S. 684 (19 Sup. Ct. 565, 43 L. ed. 858), that where a State had fixed a reasonable maximum rate, it could not compel railroad companies to sell thousand-mile tickets at a less rate, and require them to issue such tickets in the name of the purchaser and his wife and children, upon application, and declare that each ticket of that character should be valid for two years after its issuance. It was said that after the State had formally declared a reasonable maximum rate which railroad companies might charge within its boundaries, to then declare that they must sell tickets of certain kinds to

certain persons for less than the amount which had been fixed as reasonable was, in effect, an effort by legislation to discriminate in favor of certain purchasers of railroad tickets, and to compel the carriers to take less than the State itself had declared they might reasonably charge. The court was careful not to limit the power of the State to regulate common carriers, and the syllabus contains the following statement, which is supported by the opinion: "In so holding the court is not thereby interfering with the power of the legislature over railroads, as corporations or common carriers, to so legislate as to fix maximum rates, to prevent extortion or undue charges, and to promote the safety, health, convenience, or proper protection of the public; but it only says that the particular legislation in review in this case does not partake of the character of legislation fairly or reasonably necessary to attain any of those objects, and that it does violate the Federal constitution as above stated." This case has been followed by a number of others. But a moment's thought will show that there is a wide difference between holding that a State can not first fix a reasonable maximum rate and then compel the sale of tickets of a certain character to certain parties at a less rate, and the question whether, if railroads voluntarily issue tickets of a certain character, the State, through the legislature or a railroad commission, may regulate the manner of operation or dealing with passengers using such tickets. In the case now before us there is no effort to compel the issuing of mileage tickets, but a regulation if they are voluntarily issued. The case last cited is typical of one class of cases relied on. Another class comprises decisions holding, that, in the absence of statute or lawful regulation by a railroad commission, railroad companies may make reasonable regulations, and that certain agreements in regard to the manner of using mileage books were valid and binding. To this class belong the cases of Mason v. Seaboard Air-Line Ry., 159 N. C. 183 (75 S. E. 25), and Perry v. Atlantic Coast Line R. Co., supra. But these cases do not decide that a legislature or railroad commission can not make a regulation on the subject. In addition to what has just been said, it may be remarked of the case of Eschner v. Pennsylvania R. Co., 18 I. C. C. 60, that it was dealing with the act regulating interstate commerce, in which occurs a clause "that nothing in this act shall prevent . . the issuance of mileage, excursion, or commutation passenger tickets;" and that

there was no denial of the power of Congress to deal with the subject. It arose not under any requirement of an act of Congress, or rule of the commission in pursuance of power so conferred, but, in the absence of both, a complaint was made in a special case that the practice of the railroads was unreasonable and discriminatory against the complainant. What was said must be construed in the light of the question before the commission. It in no way affects the act of the legislature of this State or the rule of the State railroad commission passed under its authority.

This asserted right of liberty to contract has been again and again put forward in opposition to regulation by legislatures and railroad commissions. In Minneapolis & St. Louis R. Co. *v.* Minnesota, 186 U. S. 257 (22 Sup. Ct. 900, 46 L. ed. 1151), it was held: "The act of the legislature of Minnesota, creating a railroad commission, is not unconstitutional in assuming to establish joint through rates or tariffs over the lines of independent connecting railroads, and apportioning and dividing the joint earnings. Such a commission has a clear right to pass upon the reasonableness of contracts in which the public is interested, whether such contracts be made directly with the patrons of the road or for a joint action between railroads in the transportation of persons and property in which the public is indirectly concerned. Without deciding whether or not connecting roads may be compelled to enter into contracts as between themselves, and establish joint rates, it is none the less true that where a joint tariff between two or more roads has been agreed upon, such tariff is as much within the control of the legislature as if it related to transportation over a single line." In delivering the opinion Mr. Justice Brown said: "It is insisted that it is beyond the constitutional power of the legislature to compel companies to enter into involuntary, unreasonable, and unprofitable contracts with other companies at the instance of third parties, or to fix terms and conditions upon which such contracts shall be performed. This argument in its various applications is one which has been addressed to and considered by this court in nearly every case in which the power of the State to regulate railway charges has been called in question, and the answer made to it in those cases is equally pertinent here. Indeed, it is impossible for the State to exercise this power of regulation without interfering to some extent with the power of a railway to contract either

with its customers or connecting lines. The power is one which was said in Munn *v.* Illinois, 94 U. S. 113, to have been customarily exercised in England from time immemorial, and in this country from its first colonization, for the regulation of ferries, common carriers, hackmen, bakers, millers, wharfingers, and innkeepers; and the whole object of this class of legislation is to curtail the power to contract by limiting the exactions of those engaged in these occupations, and providing that the rendition of such services shall not raise an implied promise to pay more than a certain fixed sum."

The idea that the regulation of common carriers is altogether new is erroneous. In England in the third year of the reign of William and Mary (A. D. 1691) a statute was enacted which declared: "And whereas divers waggoners and other carriers, by combinations amongst themselves, have raised the prices of carriage of goods in many places to excessive rates, to the great injury of trade; be it therefore enacted," etc. 3 W. & M. c. 12, § 24. This remained in force until 1827. Regulating rates is only the exercise of one branch of the power of regulation.

In the celebrated and often cited case of Munn *v.* Illinois, 94 U. S. 113 (24 L. ed. 77), the subject of control and regulation, where an owner of property devotes it to a use in which the public has an interest, was thoroughly considered. In the opinion Chief Justice Waite said (pp. 125, 126): "This brings us to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what is without its operative effect. Looking, then, to the common law, from whence came the right which the constitution protects, we find that when private property is 'affected with a public interest, it ceases to be *juris privati* only.' This was said by Lord Chief Justice Hale more than two hundred years ago, in his treatise De Portibus Maris, 1 Harg. Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he

has thus created." Again (p. 130) : "Common carriers exercise a sort of public office, and have duties to perform in which the public is interested. New Jersey Nav. Co. *v.* Merchants' Bank, 6 How. 382 [12 L. ed. 465]. Their business is, therefore, 'affected with a public interest,' within the meaning of the doctrine which Lord Hale has so forcibly stated." Referring to the common-law rule that in matters affecting the public interest, if there were no statutory regulations, the owner of the property could make his rates, subject to judicial inquiry as to whether they were reasonable, but that the legislature might fix a rate, he said (p. 134) : "But a mere common-law regulation of trade or business may be changed by statute. A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law can not be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances. To limit the rate of charge for services rendered in a public employment, or for the use of property in which the public has an interest, is only changing a regulation which existed before. It establishes no new principle in the law, but only gives a new effect to an old one." The modification of the ruling in that case, as to the limitation upon the legislative power, and the extent to which the courts will inquire into whether a particular regulation amounts to a taking of property without due process of law, will be mentioned presently.

In the absence of regulation by the State, the whole subject of the making of rules and regulations is left to the common carrier, subject only to control by the courts of their reasonableness or discriminatory character. By way of illustration, the location of depots, whether a railroad will make physical connections between its road and others, how long it will keep open its stations before the arrival of trains, whether it will stop trains at certain points, whether it will discontinue trains without notice, and many other like subjects might be mentioned. But when the legislature by itself, or through the medium of a commission, has investigated

these matters and made regulations in regard to them, it will hardly be now contended that the act or rule does not supersede the power of the railroad company to make such determination, unless the act or rule itself is invalid. If what a railroad company may do in the absence of any legislative act or rule of a railroad commission is to be taken as a limitation upon the power of the legislature or the commission, then governmental power to regulate such carriers is a name only.

Our code recognizes the common-law rule as it exists in the absence of regulation by the legislature or the railroad commission. Civil Code (1910), §§ 2729, 2750. It also provides for such regulation by the commission. Sections 2630 et seq., 2662 et seq., in which a later act is codified. Construing these sections in harmony, it is evident that the power of a common carrier to make reasonable regulations must yield where regulations have been made by authority of the State, unless they are invalid.

Pursuing further the subject of liberty to contract, and the power of State regulation to affect the carrying out of contracts and the right to make them, in Chicago, Burlington & Quincy R. Co. v. McGuire, 219 U. S. 549 (31 Sup. Ct. 259, 55 L. ed. 328), it was held that the State had power to prohibit contracts limiting liability for injuries by railroads, made in advance of the injury received, and to provide that the subsequent acceptance of benefits under such a contract should not constitute satisfaction of the claim for injuries received after the contract. It was said: "Freedom of contract is a qualified and not an absolute right. There is no absolute freedom to contract as one chooses. Liberty implies the absence of arbitrary restraint—not immunity from reasonable regulations. Where police legislation has a reasonable relation to an object within governmental authority, the legislative discretion is not subject to judicial review." In Schmidinger v. City of Chicago, 226 U. S. 578 (33 Sup. Ct. 182, 57 L. ed.     ), it was declared that "There is no absolute liberty of contract, and limitations thereon by police regulations of the State are frequently necessary in the interest of public welfare, and do not violate the freedom of contract guaranteed by the fourteenth amendment." That case involved an ordinance of the City of Chicago, enacted under legislative authority, fixing standard sizes of bread loaves, and prohibiting the sale of other sizes.

The power of a legislature or of Congress to regulate common carriers, within their respective jurisdictions, and the fact that this is not destroyed because such regulations may to some extent affect the power to contract, or even contracts already made, have recently been considered by this court. *Atlantic Coast Line R. Co.* v. *State,* 135 *Ga.* 545 (69 S. E. 725, 32 L. R. A. (N. S.) 20); *Washington* v. *Atlantic Coast Line R. Co.,* 136 *Ga.* 638 (71 S. E. 1066, 38 L. R. A. (N. S.) 867); *Stephens* v. *Central Ry. Co.,* 138 *Ga.* 625 (75 S. E. 1041, 42 L. R. A. (N. S.) 541); *State* v. *Western & Atlantic R. Co.,* 138 *Ga.* 835 (76 S. E. 577). See also Armour Packing Co. *v.* United States, 209 U. S. 56 (28 Sup. Ct. 428, 52 L. ed. 681); Louisville & Nashville R. Co. *v.* Mottley, 219 U. S. 467 (31 Sup. Ct. 265, 55 L. ed. 297, 34 L. R. A. 671). In the cases last cited the Supreme Court of the United States held that contracts already made (in the one case as to rates, in the other as to free transportation) must yield to lawful regulation as to interstate commerce. In the Armour case Mr. Justice Day said (p. 82): "If the shipper sees fit to make a contract covering a definite period for a rate in force at the time, he must be taken to have done so subject to the possible change of the published rate in the manner fixed by statute, to which he must conform or suffer the penalty fixed by law." In Kentucky & Indiana Bridge Company *v.* Louisville & Nashville Railroad Co., 34 Am. & Eng. R. Cases, 630, 653 (2 I. C. C. R. 162, 189), Judge Cooley said: "If the legislature had no power to alter its police laws when contracts would be affected, then the most important and valuable reforms might be precluded by the simple device of entering into contracts for the purpose. No doctrine to that effect would be even plausible, much less sound and tenable."

Under the Dartmouth College case charters were held to be contracts. Thereupon in various States constitutional or statutory provisions were made, to the effect that all charters thereafter granted should be subject to modification or change. It has been held that all charters thereafter granted were subject to such reservation. *Central Railroad & Banking Co.* v. *State,* 54 *Ga.* 401; *Macon & Birmingham R. Co.* v. *Gibson,* 85 *Ga.* 12 (11 S. E. 442, 21 Am. St. R. 135). See also Beer Co. *v.* Massachusetts, 97 U. S. 25 (24 L. ed. 989); Patterson *v.* Kentucky, 97 U. S. 501 (24 L. ed. 1115). As has already been shown, the Supreme Court of the

United States has declared more than once that the police power of the State extends to regulating railroads as common carriers, as to intrastate business.

It may be remarked that under the allegations of the plaintiff's petition mileage and penny scrip books are only issued for one year at a time. As more than a year has elapsed since the order of the commission was passed, the question of prior contracts is of little practical application. So far as the argument relates to checking baggage nothing is said in the order on that subject, and we need not deal with such suggestion.

We now come to consider the limitation upon the power of the legislature to regulate common carriers, so far as it may be necessary for the determination of the present case. If the rule of the railroad commission under consideration violates a provision of the constitution of the United States, it would be equally void whether it was passed by the commission under legislative authority, or enacted by the legislature itself. The trial judge apparently entertained too contracted a view of the power of a sovereign State to legislate for the welfare of its people, which frequently goes under the name of the police power, and too broad a view of the absolute right to contract. In the case of Thurlow v. Commonwealth of Massachusetts, 5 Howard (46 U. S.), 504 (12 L. ed. 513), and other cases, known as the License Cases, Chief Justice Taney said (p. 582) : "But what are the police powers of a State? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a State passes a quarantine law, or a law to punish offences, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same powers; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates; and its authority to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the constitution of the United States." This is recognized as a part of the police power in Lake Shore etc. Railway Co. v. Smith, supra; Lake Shore etc. Railway Co. v. Ohio, 173 U. S. 285, 297 (19 Sup. Ct. 465, 43 L. ed. 702). In Kundling v. Chicago, 177 U. S. 183 (20 Sup. Ct. 633, 44 L. ed. 725), the court had under con-

sideration an ordinance of the City of Chicago (authorized by the State), providing for the issuing a license to persons to sell cigarettes upon payment of $100, and forbidding their sale without a license. It also provided that a license should be issued if the mayor was satisfied that the person applying was of good character and reputation and a suitable person to be entrusted with the sale of cigarettes; and required the applicant to file a bond to faithfully observe and obey the laws in regard to cigarettes. In discussing the police power of the State in respect to the regulation of businesses Mr. Justice Peckham said (p. 188) : "Regulations respecting the pursuit of a lawful trade or business are of very frequent occurrence in the various cities of the country, and what such regulations shall be and to what particular trade, business, or occupation they shall apply, are questions for the State to determine, and their determination comes within the proper exercise of the police power of the State; and unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of the citizen are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not extend beyond the power of the State to pass, and they form no subject for federal interference." In Schmidinger *v.* City of Chicago, supra, this language was approvingly quoted by Mr. Justice Day, who also said: "This court has frequently affirmed that the local authorities entrusted with the regulation of such matters, and not the courts, are primarily the judges of the necessities of local situations calling for such legislation, and the courts may only interfere with laws or ordinances passed in pursuance of the police power where they are so arbitrary as to be palpably and unmistakably in excess of any reasonable exercise of the authority conferred." See also Frisbie *v.* United States, 157 U. S. 160, 166 (15 Sup. Ct. 586, 39 L. ed. 657).

The decision in Munn *v.* Illinois, supra, substantially laid down three propositions: (1) That the legislature had power to regulate common carriers, and as a part of such power to establish rates of charges by them. (2) That the fixing of such rates was a matter for the legislative discretion. (3) That when this discretion had been exercised by the legislature, it could not be overthrown by the courts. In the opinion Chief Justice Waite used

this very strong language (p. 134) : "We know that this is a power which may be abused; but that is no argument against its existence. For protection against abuses by legislatures the people must resort to the polls, not to the courts." See also Chicago, Burlington & Quincy R. Co. v. Iowa, 94 U. S. 155 (24 L. ed. 94) ; Peik v. Chicago & Northwestern R. Co., 94 U. S. 164 (24 L. ed. 97) ; Railroad Co. v. Richmond, 96 U. S. 521, 529 (24 L. ed. 734) ; Winona & St. Peter R. Co. v. Blake, 94 U. S. 180 (24 L. ed. 99). Of the three propositions above stated the first remains undisputed. The third has been considerably modified or changed; and this modification necessarily affects to some extent the second proposition.

In the Railroad Commission Cases, 116 U. S. 307 (6 Sup. Ct. 334 et seq., 29 L. ed. 636), Chief Justice Waite said (p. 331) : "From what has thus been said, it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights, the State can not require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law." In Chicago, Milwaukee & St. Paul Ry. Co. v. Minnesota, 134 U. S. 418 (10 Sup. Ct. 462, 702, 33 L. ed. 970), it was held that an act which provided that rates of charges for the transportation of property, recommended and published by a railroad commission, should be final and conclusive as to what were equal and reasonable charges, and that there could be no judicial inquiry as to the reasonableness of such rates, was unconstitutional. In the opinion Mr. Justice Blatchford used some broad language as to the question of reasonableness being a proper one for judicial investigation. Three Justices dissented, on the ground that the decision was in conflict with that in the Munn case. Without discussing the various decisions of the Supreme Court of the United States in which the subject has been under consideration, it may be stated that sometimes the word "reasonable" has been used, and sometimes the expression "reasonable in a legal sense," and sometimes other expressions; but when the decisions are considered as a whole, they do not mean either that the legislature is deprived of all discretion in the exercise of this branch of the police power of the State, or

that the discretion of the courts is substituted entirely for that of the legislature. To hold that the legislature of a State has the power to regulate rates but no discretion as to what regulations are proper and reasonable, and that the whole subject of reasonableness is to be determined by the courts as a primary question, would be substantially to strip the lawmaking power of the State of its sovereignty, and would not comport with the theory of our State and national governments of the existence of three co-ordinate departments. If the discretion of the legislature and its power to decide what is a reasonable regulation is to be measured by the "chancellor's foot," it is but an impotent and puling thing. Moreover, if the subject of reasonableness is to be treated as one of primary discretion in the courts, unaffected by the legislative opinion on that subject, the courts may expect to be overwhelmed with questions of rate-making and railroad regulation. The legislature may enact laws directly on the subject of regulation, or they may establish railroad commissions. Such commissions are selected on the idea that their members are peculiarly qualified to deal with such questions, and they are required to devote their time and attention to the study and solution of these problems. Often the chancellor, however learned in the law, has little training in rate-making. The general rule is that legislative acts are presumed to be constitutional, and will only be declared unconstitutional when they plainly violate the fundamental law. When the legislature empowers a railroad commission to make regulations for common carriers, surely some presumption of correctness is to be indulged in favor of their rulings, especially after due hearing has been had, as in the present case.

In Gladson *v.* Minnesota, 166 U. S. 427 (17 Sup. Ct. 627, 41 L. ed. 1064), it was held that a statute of a State, which required every railroad company to stop all regular passenger-trains, running wholly within the State, at its stations at all county seats long enough to take on and discharge passengers with safety, was a legitimate exercise of the police powers of the State, and did not take property of the company without due process of law. In Atlantic Coast Line R. Co. *v.* North Carolina Corporation Commission, 206 U. S. 1 (27 Sup. Ct. 585, 51 L. ed. 933), it was held that railroad companies, "from the public nature of the business by them carried on, and the interest which the public have in their operation, are

subject as to their State business to State regulation, which may be exerted either directly by the legislative authority or by administrative bodies endowed with power to that end. The public power to regulate railroads and the private right of ownership of such property coexist, and do not the one destroy the other; and where the power to regulate is so arbitrarily exercised as to infringe the rights of ownership, the exertion is void because repugnant to the due-process and equal-protection clauses of the fourteenth amendment." Under this rule it was held that it was within the power of a State railroad commission to compel a railroad company to make reasonable connections with other roads so as to promote the convenience of the traveling public; and that an order requiring the running of an additional train for that purpose, if otherwise just and reasonable, was not inherently unjust and unreasonable because the running of such train would impose some pecuniary loss on the company. It was further declared: "While the enforcement by a State of a general scheme of maximum rates so unreasonably low as to be unjust and unreasonable may be confiscation and amount to taking property without due process of law, the State has power to compel a railroad company to perform a particular and specified duty necessary for the convenience of the public, even though it may entail some pecuniary loss."

In Interstate Commerce Commission *v.* Illinois Central R. Co., 215 U. S. 452 (30 Sup. Ct. 155, 54 L. ed. 280), referring to the interstate commerce commission, it was held: "In determining whether an order of the interstate commerce commission shall be suspended or set aside, power to make—and not the wisdom of— the order is the test, and this court must consider all relevant questions of constitutional power or right, all pertinent questions as to whether the administrative order is within the scope of the delegated authority under which it purports to be made, and also whether even if in form it is within such delegated authority it is not so in substance because so arbitrary and unreasonable as to render it invalid." Shall not the courts of the State give as much consideration to the State railroad commission in dealing with intrastate business?

In Interstate Commerce Commission *v.* Louisville & Nashville R. Co., 227 U. S. 88 (33 Sup. Ct. 185, 57 L. ed.    ), is contained a very recent utterance on the subject of the weight to be given to the determination of the interstate commerce commission

53

in passing on evidence, upon a hearing before that body. It was said: "The value of evidence in rate proceedings varies, and the weight to be given to it is peculiarly for the body experienced in regard to rates and familiar with the intricacies of rate-making. . . In this case the order of the commission restoring local rates that had been in force many years between New Orleans and neighboring cities, and making a corresponding reduction in through rates, was not arbitrary but was sustained by substantial, although conflicting, evidence; and the courts can not settle such a controversy or put their judgment against that of the commission, which is the rate-making body." These excerpts from the syllabi are sustained by the opinion rendered by Mr. Justice Lamar.

The case of Platt *v.* Lecocq, 158 Fed. 723, was cited by counsel for the defendant in error. It was a decision of the Circuit Court of Appeals of the Eighth Circuit, in which the opinion was prepared by Sanborn, J. That case did not involve a general rule regulating common carriers for the convenience of the public, but arose on the application of a bank to compel an express company to receive specie and currency after the departure of trains during the morning, and store them until the departure of trains on the next day. In the present case the evidence discloses that there are about 7,000 persons who travel as salesmen to a greater or less extent in Georgia, and who, as well as others using thousand-mile tickets, are affected by the practice of the railroad company concerning which a regulation was made by the State railroad commission after a hearing. In the opinion in the case cited, Judge Sanborn indulged in some broad expressions; but it should be noted that Mr. Justice Van Devanter, then circuit judge, declined to concur generally in the opinion of Judge Sanborn, and concurred only in the result.

In the year 1912 the South Carolina legislature passed an act which provided that any railroad company selling mileage books for transportation should receive coupons from books sold by such road on its trains for transportation within the State, and to check baggage for passengers upon presentation of such mileage books. A railroad operating in South Carolina caused to be stamped upon all interchangeable mileage books thereafter sold a statement that coupons therefrom would not be accepted in exchange for ticke[t] for a journey wholly within that State. A new form of milea[ge]

books was provided for intrastate travel in South Carolina. It was non-interchangeable, that is, good only upon the line of the road issuing it; and it was receivable only for transportation wholly within the State, as to which the coupons were made receivable, and no exchange for tickets was required. A complaint was made to the interstate commerce commission by the railroad commission of South Carolina, touching interstate business, and directed against the practice of the carriers which required that mileage should be exchanged for tickets instead of being used directly for checking baggage, or for transportation upon trains. The interstate commerce commission thereupon instituted an investigation. On October 14, 1913, a decision was rendered. The commission referred to section 22 of the act to regulate interstate commerce, which declared "that nothing in this act shall prevent . . the issuance of mileage, excursion, or commutation passenger tickets." It was said that this language had been construed as a permission to carriers in relation to interstate commerce, and not as a grant of authority to the interstate commission to compel the carriers to furnish passenger transportation at less than a reasonable rate. The next question which arose was whether, under the evidence introduced on that hearing, the regulation or practice of the carriers in South Carolina operated to make discriminations or work other positive wrongs forbidden by the act of Congress in relation to interstate commerce. It was held that the practice above described did not operate to make a discrimination as to interstate commerce, and as to it was not unreasonable. This in no way affected the power of the State legislature to enact the law in regard to intrastate business; nor, in the case before us, does it affect the power of the State railroad commission, in view of the evidence before it, to make a regulation in regard to passenger transportation wholly within the State, so as to require a railroad company issuing a mileage book or penny scrip book to accept the coupons on the trains of the selling company. Judging from the statement of the evidence before the interstate commerce commission, it was quite different from that in the present record. The opinion of the interstate commission controls as to interstate business. It does not control the judgment of the State commission, on evidence before it, in regard to intrastate business. The right of local regulation in regard to intrastate business is recognized in the opinion

of the interstate commission in that case, where it is said: "The Commission [i. e. the Interstate Commission] clearly has no power to require the carriers to receive the interchangeable mileage coupons upon trains for journeys wholly within that State. The regulation of transportation wholly within South Carolina is still with the State .authorities and beyond the control of the Commission. Neither has this Commission power to direct that the mileage sold in South Carolina, by its terms good only for transportation wholly within that State, shall be receivable for interstate journeys."

When the matter now under consideration was before the State railroad commission, after a full hearing, it passed the order which is attacked. It is true that two members of the commission dissented, but the majority of the commission passed the regulation, and that becomes the official action of the body, and must be so treated by this court, and given force accordingly. The evidence before the commission was doubtless conflicting. But they solved the conflict. It is not shown that the commission acted arbitrarily under the evidence before them. In the record brought to this court there is no lack of evidence as to the large number of people affected and the extent of the inconvenience imposed upon them. The courts ought not to interfere. The issuance of mileage books is not attacked. What is said in regard to the Federal constitution applies also, to a large extent, to the due-process clause of the State constitution, mutatis mutandis.

In view of the decision of the Supreme Court of the United States that railroads can not be compelled to issue mileage books at a rate below the general maximum rate established according to law, and in view of the ruling of the Interstate Commerce Commission in the South Carolina 'case, it may be questioned whether the regulation of the railroad commission of this .State now under consideration will have as extensive an effect as may have been anticipated by its advocates. But that is not a question for this court, in determining the power of the commission to make the regulation.

As to the contention that this order of the State railroad commission is invalid as being an interference with interstate commerce, it will appear from some of the decisions cited above that such contention is not well founded. See also *Southern Railway Co.* v. *Melton,* 133 *Ga.* 277, 298 (65 S. E. 665), and cases cited; *Southern Railway Co.* v. *Atlanta Sand &c. Co.,* 135 *Ga.* 35 (68 S. E. 807).

The order was not void as being unduly discriminatory in excepting certain larger cities. The evidence tended to show greater inconvenience in small towns. There was no discrimination injurious to the railroads, and no one else is complaining. This objection is not the same as the constitutional point sometimes raised that special or local acts can not be passed by the legislature in cases already provided for by a general law. No such constitutional point was raised, nor does it seem applicable to such an order of the railroad commission. Nor indeed was the objection as to discrimination because of a difference in regard to the larger cities urged in the brief.

We have not discussed in detail all the questions raised by the defendant in error; but none of the contentions authorize the grant of an injunction, under the facts of the case.

*Judgment reversed. All the Justices concur, except*

BECK, J., dissenting. Upon the back of the mileage books and penny scrip books which are dealt with by the rule of the railroad commission (hereinafter referred to as the commission) are certain conditions and stipulations These are signed by the purchaser at the time of the purchase, and thus between him and the railroad company selling the tickets, whether for scrip or interchangeable mileage, is created an express contract. Under that contract and by virtue of it the purchaser obtains certain advantages which are not enjoyed by one who, about to become a passenger, buys the ordinary ticket to be used for his passage and taken up on the train. The advantages secured by the purchaser of the books of coupons in question constitute a valuable consideration. The purchaser of the coupon books (and in the use of the expression "coupon books" I include both the interchangeable mileage books and the penny scrip) obtains his transportation at a rate that is considerably less than that paid by the purchaser of the ordinary ticket, the reduction amounting in some cases to twenty per cent. of the cost of transportation at the rates fixed by the railroad commission. The commission had, previously to the passage of the order in question, fixed the maximum rates for carriage between points in this State over the various lines of railroad therein; and the order which they have passed is not in the nature of one rearranging or creating a passenger tariff, but it affixes certain new and material conditions to the terms of the contract between the railroad company selling the

coupon tickets and the purchaser thereof. This contract entered into by the carrier and its patron is one voluntarily entered into by both parties thereto; by the carrier, no doubt, because it tends to increase the volume of its business, and by the purchaser for a valuable consideration. It is not contended, nor even suggested in argument, that the contract violates the policy of the law. The regulations as to the manner of the use of the coupon tickets were held by the trial court to be reasonable; and in view of the evidence submitted at the trial, tending to show the reasonableness of all the regulations in the regard just referred to, it can scarcely be denied that this holding was clearly authorized, so far as relates to the regulations themselves, without reference to the effect which other regulations sought to be imposed by the action of the commission had upon them. They are not violative of any public policy of the State; they do not adversely affect the safety of the passenger; nor do they diminish in any way the care due nor the diligence owing him by the carrier. The passenger's rights to safe transportation, to every comfort and facility guaranteed by the law or voluntarily provided for other passengers, are as complete as if he were travelling on a full-fare ticket. Consequently the carrier had the right, in order to facilitate the transaction of its business and to safeguard its income, to make these regulations, if in its opinion they were such as to accomplish the ends proposed, whether others agreed with it as to the necessity and effectiveness of these regulations in this regard or not. In *Perry* v. *Railroad Co.,* 9 *Ga. App.* 260 (70 S. E. 1122), the Court of Appeals says: "There is no law or regulation of the railroad commission which prevents a carrier from making with the members of the general public a contract by which the carrier sells to a member of the public at a reduced rate a mileage book, which shall not be good for passage on trains except from non-agency stations, or from agency stations not kept open for the sale of tickets, unless it is first exchanged for a ticket." In Mason *v.* Seaboard Air-Line Railway, 159 N. C. 183 (75 S. E. 25), the Supreme Court of North Carolina said: "The consensus of all the authorities, without a single exception so far as we have been able to find, is that by accepting such a contract at a reduced rate, when he has the opportunity to purchase the usual and ordinary ticket, the passenger enters into a contract with the carrier different from that implied by law upon the purchaser of an ordinary ticket

at full rate of fare. The purchaser is bound in such cases by the terms of the contract, and is entitled to its advantages of reduced fare." In Eschner v. Penn. Railroad Co., 18 I. C. C. R. 60, the Interstate Commerce Commission held: "If a carrier may extend or withhold the privilege of mileage, excursion, and commutation tickets, it would seem to follow that it may attach to them, as an integral part of the contract, conditions of the kind involved in this proceeding; and since we can not compel carriers to issue such tickets, we see no grounds upon which we may compel them to modify the conditions which they attach to them, so long, at least, as these conditions result, as heretofore stated, in no discrimination nor in violation of any other provision of the act. . . In a word, the right to use exchange orders and mileage books is in the nature of a privilege voluntarily accorded by carriers under their tariffs, and must be accepted by those who use such special fares with all lawful and non-discriminatory limitations that may be attached to them." And supporting this view there is abundant authority to be found in the decisions of many courts, which have been collated in the opinion of the chairman of the commission (concurred in by another member of the commission), dissenting from the action of the majority in passing the order in controversy.

I have referred to the contract between the carrier and the purchaser of the coupon books as voluntary, and it is purely so. It may be further said that the placing of the coupon books upon sale by the carrier is also voluntary, in that neither the legislature nor the commission has passed any act, or adopted any order, requiring the issuance and sale of such coupon books, and it may well be doubted whether the commission could compel the issuance of such mileage tickets while the order already passed by the commission fixing maximum rates remains of force and unchanged. In the case of Lake Shore & Mich. Railroad Co. v. Smith, 173 U. S. 684 (19 Sup. Ct. 565, 43 L. ed. 858), the Supreme Court of the United States had before it the question of the compulsory issuance of mileage tickets like those in question here, and the question of the constitutionality of an act of the legislature of the State of Michigan, which provided that thousand-mile tickets should be kept for sale at the principal ticket offices of all railroads in the State, or carrying on business partly within and partly without the State, at a price not exceeding $20 in one part, and $25 in another part of

the State; that such tickets should be made non-transferable, "but whenever required by the purchaser they shall be issued in the names of the purchaser, his wife and children, designating the names of each on the ticket, and that such tickets shall be made valid for two years from the date of purchase." The court sustained the contention of the railroad company to the effect that the act was unconstitutional because violative of that part of the constitution of the United States which forbids the taking of property without due process of law, and requires the equal protection of the laws. This case has been followed by the courts of last resort in a number of the States—reluctantly by some, and without question or hesitation in others. State *v.* Bonneval, 128 La. 902 (55 So. R. 569, 24 Ann. Cas. (1912C) 837).

It appearing, then, that the sale of the mileage tickets, and the assent of the purchaser to the conditions and stipulations entered thereon and evidenced by his signature attached thereto, constitute a contract voluntarily entered into by both parties, and that the contract was not violative of the public policy of the State, how could the commission attach new terms or conditions to the contract, which in substance would have the effect of making a different contract from that into which the parties had entered? It is not necessary to consider here whether the commission could prohibit entirely the issuance of the mileage books, on the ground that it would be discriminatory in favor of a certain class of the public; but the question is, whether, without attempting to abolish the use of the mileage books, they could change the contract which was entered into in connection with the sale and purchase thereof. We recognize the principle that the right to contract is not absolute and universal. It was well said by the Supreme Court of the United States in Frisbie *v.* United States, 157 U. S. 165, 166 (15 Sup. Ct. 586, 39 L. ed. 657): "It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. It may deny to all the right to contract for the purchase or sale of lottery tickets; to the minor the right to assume any obligations, except for the necessaries of existence; to the common carrier the power to make any contract releasing himself from negligence, and, indeed, may restrain all engaged in any employment from any contract in the course of that employment which is against public policy. The possession of this

power by government in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property." The same principle is stated in the case of Chicago &c. R. Co. v. McGuire, 219 U. S. 549 (31 Sup. Ct. 259, 55 L. ed. 328), and in numerous cases there cited. But it is equally true, as was said by the same court in the case of Allgeyer v. Louisiana, 165 U. S. 578, 589 (17 Sup. Ct. 427, 41 L. ed. 832), that "The liberty mentioned in that amendment [fourteenth] means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned." It can certainly be said that freedom in the exercise of the right to contract is the general rule, subject always to interference therewith by the State in the exercise of its police power, where it can be properly invoked to preserve or safeguard the health, safety, or welfare of the public. But before an interference with the freedom of contract can be justified upon the ground that it is resorted to in the exercise of the police power by the State, it must appear that the exercise of this power has a clear relation to the purpose in view and is necessary to the accomplishment of the ends for which that power can be exercised. In the use of the mileage tickets under the conditions which form a part of the stipulations assented to by the purchaser, there is, as we have said before, the same care for the welfare, the comfort, and the protection of the user thereof as if he had bought the usual and ordinary ticket good for passage at the rates prescribed by the railroad commission. Consequently, the exercise of the police power in case of the purchase and use by passengers of the mileage books can not be justified on the ground that it is necessary to safeguard or to insure the health, comfort, or welfare of the passenger.

Now, if it be insisted that in addition to the exercise of the police power for the purpose of securing and protecting the health, comfort, and welfare of the members of the public, it may be invoked

also to afford him greater convenience and to diminish inconvenience incurred in traveling, that contention can well be met in the present case by calling attention to the fact that the inconvenience to which the holder of one of these mileage tickets is subjected can be only slightly greater than the inconvenience every traveler by railway, who seeks to buy the usual and ordinary ticket, is subjected to, when in a limited time the traveler seeks to purchase a ticket at stations where one agent must wait upon a considerable number of customers. But whether the inconvenience of the user of the mileage ticket is only slightly greater than that of the purchaser of the ordinary ticket, this inconvenience is one of the things which he contracted, for a valuable consideration, to undergo; and it is optional on his part whether the advantage to him secured in the decrease of the amount to be paid for his transportation is compensation to him for the inconvenience which he contracts to undergo. The holder of the coupon book buys his transportation, it might be said, at a bargain. Has he not, and should he not have, the right to bargain that he will exercise some degree of patience and undergo some degree of inconvenience for the advantage and profit which he secures from the bargain? In consideration also of the greater trouble, inconvenience, and labor incurred by the railway selling the mileage ticket, has it not the right to adopt the method of handling and keeping accounts with respect thereto which the court below found, under the evidence, to be reasonable in view of its being a check against loss of revenue derived from the sale of this class of tickets? If the holders of the coupon tickets were entitled to have the coupons taken up just as tickets are taken up, and the coupons by the order of the commission be thus converted into an ordinary ticket, then the railroad loses part of the consideration which was the inducement for the issuance of such coupon books at a reduced rate, and the purchaser of a mileage ticket good for 1,000 miles would secure for $20 that for which other members of the public would have to pay $25. To hold that a ticket voluntarily sold at a reduced price by the railroad, and purchased by a prospective passenger in consideration of the reduction, can by the order of the railroad commission be stripped of the reasonable conditions which were attached to the sale thereof at such reduced price, and be made to serve all of the purposes of a regular passage ticket, without having been exchanged for a

passage ticket, would be to give to the purchasers of the coupon books an advantage merely because they bought transportation in larger quantities than did the purchaser of the usual ticket. I do not think the commission can confer upon a purchaser of transportation in large quantities such an advantage over the purchaser in less quantities, especially while the order fixing maximum rates remains of force.

It will be observed that I have several times spoken of the exercise of the police power. In doing so I have, for the sake of the argument, treated the order of the railroad commission under consideration as upon the same plane, and as having the same effect and authority, as a legislative enactment; but I do not intend for it to be inferred that I am of the opinion that the railroad commission could exercise that great power, reserved to the State, as completely as the legislature may do in proper cases.

The authority to adopt and to put into effect the order of the commission is sought to be upheld under the provisions of the Civil Code, § 2638. That section provides, that all contracts and agreements between railroad companies doing business in this State, as to rates of freight and passenger tariffs, shall be submitted to the railroad commission for inspection and correction, that it may be seen whether or not they are a violation of the law or of the provisions of the constitution, or of article 6 of chapter 2 of the Civil Code, or of the rules or regulations of the railroad commission; and that said commissioners may make such rules and regulations as to said contracts and agreements as may be deemed necessary and proper. It may well be doubted whether or not contracts such as are to be affected by the order of the commission under consideration, that is, terms and stipulations annexed to the sale of these mileage books, which become a contract between the railroad company and the purchaser of the book, upon the written agreement of the purchaser thereof and the payment of the purchase-price, fall within the provisions of this section; but even if they did, it is clear, if I am right in the conclusion which I have announced above, that the order amounted to an unlawful interference with the right to contract, and that any such regulation as that embodied in this order of the commission would not be embraced within the authority to make necessary and proper rules and regulations; for, as I have pointed out, it could only be justified

as a proper exercise of the police power, and that power could not be exercised for the purpose sought to be accomplished by this order, in view of the object with respect to which it is invoked. And this is said without reference to the power of the commission—an administrative body—to exercise the police power.

For these reasons I am of the opinion that the order of the commission under attack should have been adjudged illegal and void, and that the judgment granting the injunction should be affirmed.